MINERALS SEPARATION, Limited, et al. v. HYDE.

(District Court, D. Montana. July 28, 1913.)

No. 1,076.

1. PATENTS (§ 16*)—PATENTABILITY—"PROCESS"—"PATENTABLE PROCESS."

Broadly speaking, a "process" is a definite combination of new or old elements, ingredients, operations, ways, or means to produce a new, improved, or old result, and any substantial change therein by omission, to the same or better result, or by modification or substitution, with different function, to the same or better result, is a new and patentable process. New or substantially changed methods whereby the product is bettered, increased, or cheapened may be a new and "patentable process."

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 14, 15; Dec. Dig. § 16.*

For other definitions, see Words and Phrases, vol. 6, pp. 5642, 5643; vol. 8, p. 7766; vol. 6, p. 5235.]

2. PATENTS (§ 29*)—PROCESS—DESCRIPTION—STATEMENT OF QUANTITIES.

In a patent for a process, which is not of itself the result sought, but only the means thereto, a range of quantities that leaves something to the judgment of the operator is all that can be described, and is sufficient.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 29.*]

3. PATENTS (§ 92*)—PERSONS ENTITLED TO PATENTS—JOINT INVENTORS.

Where an invention was the result of experiments made by an employé under instructions given by his employers, after consultation between themselves, to which each contributed suggestions, from time to time observing his work and obtaining reports thereof, it was the joint invention of the employers, and properly patented as such.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 124; Dec. Dig. § 92.*]

4. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF ORE CONCENTRATION.

The Sulman, Picard, and Ballot patent No. 835,120, for a process of ore concentration, was not anticipated, and discloses novelty and invention; also held infringed.

In Equity. Suit by Minerals Separation, Limited, and the Minerals Separation American Syndicate, Limited, against James M. Hyde. On final hearing. Decree for complainants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Henry D. Williams, of New York City, and O. W. McConnell, of Helena, Mont., for complainants.

Sheridan, Wilkinson, Scott & Richmond, of Chicago, Ill., and Kremer, Sanders & Kremer, of Butte, Mont., for defendant.

BOURQUIN, District Judge. Complainants are owner and its licensee of United States patent No. 835,120, for improvements in a process of ore concentration, issued on an application filed May 29, 1905, by said owner's grantors, Messrs. Sulman, Picard, and Ballot, of London, England, joint inventors and patentees, and this suit is for infringement of certain claims of said patent by defendant, a former employé of said owner, and by it trained in the process. The defenses are various grounds of invalidity, hereinafter noted so far as of merit and seriously urged, and noninfringement.

The invention claimed, in general terms, may be said to be the discovery, in March, 1905, that if a very small and appropriate quantity of an oily substance, ranging around .02 per cent. to .5 per cent. of the weight of the ore be added to a pulp of water and finely pulverized ore (the slimes being helpful and most easily recovered), and the whole vigorously agitated and thereby thoroughly aërated by great and excess quantities of air, the metalliferous particles are oiled and adhere in a complete envelope to or of bubbles of the air, and rise to the surface of the mixture on cessation of agitation, forming a strong, coherent, and stable froth easily removed. The process may be aided by heat to more quickly and effectively disseminate the oily substance through the pulp, and bring it into contact with the metalliferous particles, and may also be aided by a mineral acid or salt up to 1 per cent. thereof of the weight of the ore to increase the preferential affinity of the oil for metal over gangue, but not sufficient acid to cause chemical action on the metal, nor is it intended to generate gas for flotation. The patent specification is full, complete, and clear to those skilled in the art, and describes one well-known apparatus of mixing vessels, spitzkasten, etc., and the operation of the process therewith.

The claims are general and particular, all calling for oil and agitation to produce a froth, some defining a range of quantities of oily substance, some likewise of acid, some specifying oily substance alone, some oily substance in various combinations with heat or acid and with both. The main defense of invalidity is lack of novelty and anticipation. In reference thereto it appears from the evidence that the use of oil, air, and agitation in ore concentration, separately and in various combinations. and with other ingredients, was well known to the art prior to the discovery of the process in suit. To briefly summarize the prior processes, some of them were bulk oil processes, using oil in such large quantities that, it taking up the metalliferous particles in the pulp the mass thereof was yet sufficiently buoyant to float to the surface of the water, the gangue sinking. Concentration being more essential for lean ores, economy is the foundation of success; so other of these processes reduced the amount of oil to a degree where it was not sufficient of itself to float the metal, and to aid therein air, steam, or gas was injected to render the mass spongy. Another

process further reduced the oil, and to around 4 per cent. to 6 per cent. in weight of the metalliferous content of the ore, the somewhat novel result being that the metalliferous particles were by the oil agglomerated into granules which *sank* in the water and were retained in the mixing vessel, while the gangue *rose* and was carried off by upcast. Some dispensed with oil, and employed surface tension or skin flotation by floating off the powdered metalliferous particles on the surface of quietly flowing waters, or by injecting air, steam, or gas into the mixture of ore and water, or by generating gas therein, whereby bubbles attached to said particles and carried them to the surface of the water, in all the gangue sinking. Another process sought the same end by spraying the oiled metalliferous particles through the air and onto water, where they remained, the gangue sinking. In some processes acid was used to generate gas in situ for flotation, while in others it was used solely to render more pronounced the selective attribute of oil for metal over gangue. This last feature was the discovery, so far as ore concentration is concerned, of Carrie J. Everson, of Chicago, to whom a domestic patent embodying it was issued in 1886. In some heat was used to hasten the action of the oil, and some resorted to agitation.

For anticipation, defendant relies most upon Froment's patents and working description. They date from 1902 and 1903. The process thereof is one wherein the ore is carefully crushed in two operations so as to minimize slime, and is first deslimed, for that the slime is "too fine to be treated," quoting Froment. Thereupon to a mixture of deslimed ore and water, oil and carbonate of lime (which may be limestone) are added proportionate to the weight and richness of the ore, from 1 per cent. of oil in weight of the ore for ore containing up to 5 per cent. of metal, to 3½ per cent. of oil for ore containing 50 per cent. of metal, and about 1 per cent. of carbonate of lime in weight of the ore, or 2½ per cent. in difficult cases, or more, and in like proportions to the oil for richer ore, it requiring more gas. Agitation in mixers containing two stirrers revolving in opposite directions and for a few minutes, or about 10 minutes, at about 300 revolutions per minute, the "chief point" being that all metallic particles are brought "into thorough contact with the oil," is described by Froment. The mixture is then discharged into a vat containing a perforated coil through which sulphuric acid is introduced and in quantity about cent. per cent. of the carbonate of lime, and a rake therein turns slowly and about 10 to 12 revolutions per minute, to prevent the ore collecting at the bottom in too compact a mass.

Steam may also be injected through said coil to assist the reaction, but it is necessary in only cold countries. The reaction of the acid generates gas which in bubbles carry the sulphides to the surface, there skimmed or pushed into a hopper. Such thereof as fall back and sink are otherwise recovered. A large proportion of the oil may be recovered from the concentrates in a press. Froment's patents refer to the use of "gas of any kind," that the bubbles will "become covered with an envelope of sulphides," and, rising to the surface, "form a kind of metallic magma," and that the "formation of these

metallic spherules is singularly active if the gas is in a nascent state." Froment's patents, working description, and an apparatus therefor were purchased in 1903 by the patentees of the patent in suit. It may be noted that prior to said purchase, and continuously since, said patentees were and now are associates and metallurgists, chemists, experimenters, inventors, and operators in ore reduction in various parts of the world, with headquarters in London. To them and in that behalf have issued patents, domestic and foreign, and they have purchased others. They are of complainants, and much of their work has been for complainants. There is little evidence of practical use of any of these prior processes, and no substantial evidence that any substantial commercial success has accrued to any of them, or that any of them has had any considerable continuous successful operation. Some have operated commercially with some small success, and some are long since abandoned as impracticable, experiments, failures. Froment's process has not been in practical operation.

Complainants' process has, in instances, displaced some of the prior, and has firmly established itself as a new and valuable method of ore reduction. The evidence shows many and large plants thereof, built or building, in widely separated parts of the world. Its successful operations, practically from discovery, have recovered, and largely from waste and tailings, values aggregating near $9,000,000, and at a profit of near $4,000,000 to the patent owner and its licensees. Detailed comment in respect to anticipation is little necessary save to Froment. Looking to the evidence, and therefrom contrasting his process with complainants', Froment's requires several times the quantity of oil that does this in suit, both by examination of the patents and working description and by tests in evidence. Froment crushes the ore in two operations, and deslimes it before treatment because the slime is too fine to be treated by his process, while the process in suit needs but one crushing operation, and finds slime advantageous and most easily recovered. Froment employs carbonate of lime; the process in suit does not. Froment *requires* acid, and in greater quantity and for a different function than does the process in suit, which latter *may or may not* use acid. Both may use heat, and both require agitation, Froment, agitation only to disseminate the oil, the process in suit for that purpose, and also to aerate. Froment's result is by flotation by gas generated in situ; this in suit is by flotation by air introduced by vigorous agitation. Froment's product is like unto a magma, a spongy, pasty mass of oil and metallic particles, and more or less gas bubbles, while this in suit is a froth of oil and metallic particles and air bubbles. Froment's requires oil in such quantity that he deems it worthy of recovery from the concentrates so far as it can be; this in suit so little oil it disappears, is not sensible to sight or touch upon the concentrates, but only to analysis. In Froment's it would seem that the metallic particles are floated like the basket of a balloon, while in this, like the very envelope of a balloon. Froment's is costly, while this is cheap—relatively. And from the evidence it would seem that Froment's process would fail in practical operation, while this in suit has

succeeded. In Froment's, he oils the metallic particles by agitation, then when the mixture is quiescent, generates gas therein by quick reaction followed by immediate and direct rising of the gas bubbles to the surface in which they may come into contact with but few metallic particles. In this in suit vigorous agitation of the mixture beats great and excess volumes of air therein, likely bringing the ultimate air bubbles into repeated contact with many metallic particles. The action of the gas in Froment's is almost explosive in nature. He speaks of a proportion of carbonate of lime to be sought, as in his test tube example the reaction may be so sudden and violent as to project the metallic particles out of the tube. Froment's gas bubbles, quick formed and quick rising, it may be arrive at the surface with expansion still in progress. These or analogous reasons may account for Froment's magma, breaking gas bubbles, and fragile evanescent froth in so far as his result is like unto froth, and also may account for the process in suit's strong and lasting froth.

One of the complainant's experts, Dr. Adolf Liebman, of London, characterizes Froment's product as not a froth but a magma, and his process as one involving the principles of skin flotation assisted by bubbles of carbonic acid. He further testifies that in the process in suit is produced a result which was never obtained before; that the froth is of a peculiar character, "consisting of air bubbles which, in their covering film, have the minerals embedded in such manner that they form a complete surface all over the air bubbles"; that though "the very light and easily destructible air bubbles are covered with a heavy mineral, yet the froth is stable and utterly different, so far as this property is concerned, from any froth known" to him; that "it appears as if the minerals were protecting the tender air bubble like an armor guarding it," so that "the froth has a long life," and one is "tempted to say it is permanent, at least as far as metallurgical operations are concerned"; that he himself had "seen a froth standing for 24 hours without the least change having taken place"; that a "very striking difference between the previous processes and the process of the patent in suit is the difference between failure and success"; that "the simplicity of the operation as compared with the prior attempts is startling."

Another of complainants' experts, Dr. Charles F. Chandler, of New York, testified that the process in suit is new and surprising; that "there is nothing like it disclosed in the prior art." These and other learned gentlemen gave at length reasons for the foregoing and like views and conclusions. Defendant's expert, Dr. Eugene A. Byrnes, of Washington, is to the contrary.

[1] The differences hereinbefore set out between Froment's process and this in suit are so obvious, numerous, radical, and in many respects vital, it is clear they constitute different processes. They are different in ingredients, function of some thereof, combination, manipulation, principle, and result. Their points of resemblance only serve to accentuate their difference. Broadly speaking, a process is a definite combination of new or old elements, ingredients, operations, ways, or

means to produce a new, improved, or old result. Any substantial change therein, by omission to the same or better result, or by modification or substitution with different function to the same or better result, is a new and patentable process. New or substantially changed methods whereby the product is bettered, increased, cheapened, may be a new and patentable process. Thus are the cases. See Mowry v. Whitney, 14 Wall. 640, 20 L. Ed. 860; Dental Co. Case, 93 U. S. 494, 23 L. Ed. 952; Tilghman v. Proctor, 102 U. S. 722, 26 L. Ed. 279; Loom Co. Case, 105 U. S. 587, 26 L. Ed. 1177; Lawther v. Hamilton, 124 U. S. 6, 8 Sup. Ct. 342, 31 L. Ed. 325; Richards Case, 159 U. S. 485, 16 Sup. Ct. 53, 40 L. Ed. 225; Steel Co. Case, 185 U. S. 420, 22 Sup. Ct. 698, 46 L. Ed. 968; Expanded Metal Case, 214 U. S. 384, 29 Sup. Ct. 652, 53 L. Ed. 1034; Rubber Co. Case, 220 U. S. 443, 31 Sup. Ct. 444, 55 L. Ed. 527.

In this suit the doctrine of equivalents has no application. The process in suit is so clearly new that no exhaustive discussion of facts, cases, or law is necessary to distinguish it from other processes, or to demonstrate its novelty. The patentees herein discovered a new, cheap, simple, practical, and useful way or process to combine oil and air, and by agitation to float and secure the metallic content in ore concentration. The argument that the prior state of the art was such that to any one skilled therein the process in suit at the time of its discovery was obvious may, under the circumstances, be well answered by the cases:

"Knowledge after the event is always easy. * * * But the law has other tests of invention than subtle conjectures of what might have been seen and yet was not." Rubber Co. Case, 220 U. S. 435, 31 Sup. Ct. 444, 55 L. Ed. 527.

See Expanded Metal Case, 214 U. S. 381, 29 Sup. Ct. 652, 53 L. Ed. 1034.

[2] To whatever extent the patentees herein drew from the prior art, as they rightfully could, they took the last and successful step. It is urged, however, that as the patent in suit does not specify exact quantities of oil and acid, but a range thereof, it describes merely an experiment not patentable. It is true every ore presents its own problem of reduction. So, while all may lend themselves to a general method, each may require some modification of the method. All skilled in the art understand this, and know that in addition to the best scientific theory they must add the light given by trial and practice. Thus only, in the majority of cases, are good and the best results obtained in any ore reduction—smelting, milling, or concentration. It is believed that at least in cases where the combination or process is not of itself the result sought, but only the means thereto, a range of quantities that leaves something to the judgment of the operator is all that can be described, and is sufficiently definite. See Mowry v. Whitney, 81 U. S. 646, 20 L. Ed. 860; Wood v. Underhill, 5 How. 5, 12 L. Ed. 23. The patent for an ore reduction process that does not is a rarity indeed. To the contention that as in Froment's process the agitation must entrain some air like unto that of complainants', and

207 F.—61

so the latter lacks novelty, it may be observed that if so, it was unintentional and unrecognized, in that Froment had in mind only flotation by quick acting gas generated in situ, it aided the art none, and is unimportant. See Tilghman v. Proctor, 102 U. S. 711, 26 L. Ed. 279.

And to the argument that in operating Froment, in rightful economy and decrease of oil and in rightful omission of carbonate of lime in treating ore containing it in sufficient quantity, his process would approximate this in suit and arrive at a like froth, and hence lack of novelty in the latter, the response is that the fact that infringement may be easy does not impeach an otherwise valid invention, and that if Froment's methods are modified until they approximate complainants' and produce a like product, the process is no longer Froment's but is complainants'. At the argument, with apparatus a number of tests and demonstrations were made in the presence of the court, both of the process in suit, of Froment's, and of others of the prior art, of much assistance in arriving at conclusions herein.

Upon all the evidence the court is of the opinion the defense of lack of novelty and anticipation is not established.

[3] Another defense is that the invention is not joint. It seems the patentees were experimenting with the Cattermole Granulation process. An experimenter in their employ, in obedience to their instructions determined on by consultation between all said patentees and to which each contributed suggestions, gradually reduced the amount of oil until the result was the peculiar froth of the process in suit. He frequently reported to his employers, who frequently observed his labors, and they made a record thereof in the form of reports by two of them to the third, who was chairman of the owning complainant herein, and for whose ultimate benefit the experiments were conducted. This experimenter was but the instrument through which the genius of these patentees found expression. The circumstances are sufficient to constitute these patentees joint discoverers. At any rate, it is not proven they are not. Although some of the claims in issue include elements not absolutely essential, viz., heat and acid, and in respect to which they may afford no protection, they are not invalidated by undeceiving superfluous features, if heat and acid are such. The patent is valid in respect to all claims in issue.

[4] In the matter of the defense of noninfringement, it appears when the charge of infringement was brought to defendant's knowledge he refused to permit an agent of complainants to inspect his plant. This agent later secured brief access at night, observed, noted, and carried away some of the froth then being produced. This agent is a mining engineer and metallurgist. He describes the defendant's plant, and gives it as his opinion, being versed in complainants' process, that the process therein was substantially that of complainants. Dr. Chandler analyzed the froth so secured, and found its components practically the same as those of froth from samples of some of defendant's materials thereafter furnished and treated by complainants' process, and Dr. Chandler pronounced it as his opinion, based thereon, on the testimony of the agent aforesaid and on his knowledge of complainants'

process, that defendant's operations were of complainants' process. Defendant, pending this suit, filed an application for and procured the issue of a domestic patent for a flotation process like to this in suit, which Dr. Leibman testifies "contains a description of the process disclosed in the patent in suit," and "discloses an apparatus for carrying on the process in suit." And so doth it seem to the court. Although defendant testified, he professed ignorance of the amount of oil and acid used in his plant and operations. Enough appears in the evidence to compel the conclusion defendant was using complainants' process and was infringing the claims in issue as charged.

It is worthy of note that during the taking of testimony complainants repeatedly offered to repeat, in the presence of defendant and his counsel, any of the tests or experiments testified to by their experts. They also repeatedly objected to tests, experiments, and apparatus and operations of defendant, unless an opportunity was offered complainants to repeat the experiments, and unless defendant furnished like materials therefor, and unless the apparatus were offered in evidence or access to them was given complainants. Save for some of defendant's materials furnished complainant, it does not appear to what extent, if at all, defendant obviated these objections. Otherwise the consideration of the case might be affected by them. See Steel Co. Case, 185 U. S. 420, 22 Sup. Ct. 698, 46 L. Ed. 968.

A decree in accordance herewith, as demanded in the bill of complaint other than for treble damages, will be entered; an accounting to be had before the master.