MINERALS SEPARATION, LIMITED, et al., v. BUTTE & SUPERIOR MINING CO.

(District Court, D. Montana.   August 25, 1917.)

No. 8.

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—PROCESS OF ORE CONCENTRATION.

The Sulman, Picard & Ballot patent, No. 835,120, for a process of ore concentration by air bubble flotation, is valid, and while, as construed by the Supreme Court, and since the disclaimer of claims 9, 10, and 11, it is limited to a process the results of which are obtained by the use of oil "amounting to a fraction of 1 per cent. on the ore," infringement is not avoided by the use of a larger percentage of oil, where the process is the same, and the excess of oil is either without effect or renders the process less efficient.

2. PATENTS ☞154—DISCLAIMERS—TIME AND REQUISITES.

A disclaimer of claims of a patent, filed 107 days after a decision of the Supreme Court adjudging them invalid, and which conforms to the language of the decision, is timely and sufficient.

In Equity.   Suit by the Minerals Separation, Limited, and others against the Butte & Superior Mining Company.   On final hearing. Decree for complainants.

Henry D. Williams, William H. Kenyon, and Lindley M. Garrison, all of New York City, and Odell W. McConnell, of Helena, Mont., for plaintiffs.

W. A. Scott and Thomas F. Sheridan, both of Chicago, Ill., and J. Bruce Kremer, of Butte, Mont., for defendant.

BOURQUIN, District Judge.   This is trial on the merits of the suit reported in 237 Fed. 401.   It involves the patent and claims of the Hyde suit, wherein the Supreme Court (242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286) held the patent valid, but some claims invalid. The issues are as in the Hyde suit, viz. novelty, invention, infringement, and in addition defenses of unreasonable delay and defects in disclaimer of the invalid claims, and estoppel by reason of statements by plaintiffs' counsel to the Supreme Court in arguing the Hyde suit.   The evidence herein is that submitted during 25 days and also the record in the Hyde suit.   So far as heretofore known, the nature and history of the discovery and invention (a process of ore concentration by air flotation) are fairly set out in reports of the Hyde suit (242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286; 214 Fed. 100, —— C. C. A. ——; [D. C.] 207 Fed. 956), of the Miami suit (244 Fed. 752, —— C. C. A. ——; [D. C.] 237 Fed. 609), and of foreign suits cited in footnote on page 754 of 244 Fed., page —— of —— C. C. A.   This suit is an important contribution, and yet it discloses that, though the use of the process is very wide, extensive and growing, its simplicity, economy, and success still surprise and gratify the metallurgical world, and its laws or principles of operation still interest and puzzle the scientists.   "In the beginning it was very little knowledge and mostly guesswork, and since then there has been every year a little

more knowledge and still a great deal of guesswork," testifies one of defendant's experts, Prof. Bancroft, of Cornell, a physical chemist of note, acquainted with the process since 1906, and lecturer upon it since 1912. Though speaking for himself alone, the learned doctor's estimate might well be applied to all, practical layman and expert scientist alike.

At the same time, though heretofore somewhat ambiguous and obscure, present knowledge warrants the conclusion that the gist of this remarkable and valuable process and the actual discovery and invention are that, whereas, theretofore in ore concentration air had been used in desultory and fugitive bubbles as a makeshift incident of and supplement to oil and skin flotation, air can be made to do all the work by creating in water ore pulp modified by a suitable oily contaminant an infinitude of bubbles. It is the first of its kind, and the patent sufficiently discloses it and methods to those skilled in the art.

Ambiguity and obscurity were as much due to the extreme mechanical simplicity of the process as to the inability then and now to know and explain all its laws or principles. The tendency was to attach prime importance to reduction in amount of oil used, when in fact this is but a necessary incident (for which there are substitutes if not equivalents) to the creation of the infinitude of bubbles that do the work. Despite this tendency, and to overlook the simple and obvious, the patent fairly clearly sets out the various ways and means to create this infinitude of bubbles and that they do the work. The tests to determine which kind and amount of "oily substance yields the proportion of froth or scum desired," that flotation is "mainly from the inclusion of air bubbles," the froth, the agitation, all are so many guides in the patent, pointing the skilled operator to and including the infinitude of bubbles and the degree of agitation and amount of soap or oil to produce such bubbles, as surely as the word "crystallization" points to appropriate temperature in Commercial Co. v. Canning Co., 135 U. S. 189, 10 Sup. Ct. 718, 34 L. Ed. 88, and the words "uttered sound" by the "human voice" to articulate speech in the Telephone Cases, 126 U. S. 531, 8 Sup. Ct. 778, 31 L. Ed. 863.

Of the new evidence herein are learned dissertations upon the philosophy of the process, upon the philosophy of bubbles, the heart of it, by Profs. Bancroft, of Cornell, and Taggart and Beach, of Yale, and Drs. Sadtler, of Philadelphia, and Grosvenor, of New York. From these it is gathered that the mere introduction of particles of air into a liquid does not create bubbles, but that they are created by subsequent agitation, either applied, or self-agitation. Air particles, introduced into pure water, are incapable of creating bubbles. The reasons are the surface tension of the water, and the lack of viscosity to create a sufficient film about the air particles, compel the escape of the air particles into the atmosphere, and no bubble is formed. Some soaps and oils possess the quality to lessen this surface tension of water and to give or increase this necessary viscosity. Their addition in appropriate quantity to water enables air particles introduced

therein to create bubbles.  Rather, the meeting and coaction of water, oil, and air create a film composed of all three, and which surrounds the air particles.  This film is more viscous than the mass of the water, and, rising to the surface, the tension of which (and of the film) has been reduced by the oil, maintains itself as an air bubble. This quality of oil is of first importance in the process.  Another of lesser importance, and which all oils possess, is the "preferential affinity for metalliferous matter over gangue."  Of lesser importance because it is now known (and patented) that, given another contaminant than oil, but which possesses the like bubble-making quality, though not the said "preferential affinity," the process is equally successfully worked. Air also possesses this "preferential affinity," and in view of the foregoing it well may be that the capture as well as the flotation of the metallic particles is more due to the great volume of air than to the infinitesimal oil.  That in this process air without oil cannot capture and retain the metallic particles seems due to its inability to create bubbles without oil.  And why this capture in any case is still of the unsolved phenomena of the process.  On the other hand, water has a preferential affinity for gangue over metalliferous matter; that is, it wets the former more readily than it does the latter.  And this contributes to the process, in that oil and air displace water from the surface of metalliferous matter more easily and quickly than from gangue, and so more readily capture and float the former than the latter.  At the same time, despite these preferential affinities, in successful operation of the process the bubbles generally float more gangue than metal, more in quantity, but not in proportion, and why is also unsolved.

There are "critical proportions" of any oil used in this process; perhaps not a sharp divide, but rather a broad one.  For the amount of oil to produce sufficient and efficient bubbles must depend on many other factors, viz. the working cell space, amount of water, degree of agitation, kind and amount of ore, and perhaps on occasion amount of metallic content, kind of oil, etc.  For example, if a ton of ore be agitated in a lake of water, doubtless a lake of oil will be necessary to create sufficient bubbles to capture the metal in the ore.  But with bona fide operations in a good, workmanlike manner, with the proportion of space, water, agitation, etc., such operations and manner dictate, the range in amount of oil will be narrow and well within 1 per cent. on the ore.  These "critical proportions" are like those known to and solved by every child with its pipe and bowl of suds.  Too little soap, the bubbles are few, small, fragile, and break quickly.  Too much soap, they flow from the pipe in a torrent, are heavy, and refuse to float.  The right amount of soap, the "critical proportions," his bubbles are large, detach readily, and float high, far, and for long.  So is it with the bubbles in this process. With excess oil, but not enough to defeat bubbles altogether, though of fair aspect to the eye, the bubbles will not do the work.  In the excess oil in the films the metallic particles do not cling, but swim or slide to the bubble's lower surface, "neck off," detach, and sink. The untechnical workman recognizes there are "critical proportions"

of oil, and small deviation from the predetermined amount in the feed, whether more or less, manifests itself to him in the appearance of the froth and poorer results; and he knows and remedies the error in oil.

Metallic content of ore seems of little importance—sometimes seems to require oil inversely. For example, a local operator with the process upon ore from the same vein as defendant's, uses seven tenths of a pound of oil per ton of ore of 11.23 per cent. zinc content, making 50.59 per cent. concentrates with 94 per cent. recoveries, and in the same plant uses 2.83 pounds of the like oil per ton of tails of .97 per cent. copper content, making 9.085 per cent. concentrates and .266 per cent. tails. It is apparent it is the air, and not at all the oil, that floats the mineral, noting that in the first of this example 211 pounds of zinc are floated by air bubbles in the creation of which only seven tenths of a pound of oil is used. How the air particles are introduced into the pulp is immaterial. For, introduced, they are still particles, and not bubbles. Agitation subsequent to introduction is vital, and alone can convert air particles into water-oil-air bubbles. It is this subsequent agitation that within the claims of the patent agitates "the mixture until the oil-coated mineral matter forms into a froth," or "to form a froth." And it is all one, whether this be applied agitation or self-agitation—the agitation set up by the air particles themselves in merely rising through the mass and thereby coming in contact with both water and oil, all coacting to form bubbles which capture the metal. The mineral particles, either oiled before or by contact with bubbles, attach to and enter the viscous film of the bubbles. The particles also increase the viscosity of the bubble films, armor them, and increase their stability, perhaps as stays that, decreasing the area of unsupported surfaces, increase the latters' ability to resist rupture.

The great mass of new evidence herein is but cumulative of the Hyde suit. The only new publication is the California Journal of Technology, detailing a suggestive, but rather misleading and abandoned, experiment, sufficiently referred to and disposed of in the Miami suit. There is much evidence that progress in the process and methods of operating it now discloses that, with some ores and some oils or mixtures of oils, the process can be fairly successfully operated with 1 per cent. and more of oil. This is really admitted by plaintiff, and is taken as proven. But it is also proven, practically without conflict, that in all the operations with this process not to exceed .2 per cent. of oil is used, save by defendant and others in like situation, and only since the decision in the Hyde suit, and solely to avoid infringement; that some oils are effective, and more are ineffective, to operate the process; and that the excess oil used is useless, wasted, and harmful.

[1] But the defendant contends that this evidence demonstrates the process lacks novelty and invention, and that because of it the record is substantially different from the Hyde suit, the decision there should not control here, and the patent is and ought to be held invalid. This is without support in the patent and Hyde decision. In describing the invention the patent refers to Cattermole and says that the patentees "have found that, if the proportion of oily substance be considerably

reduced, say to a fraction of 1 per cent. on the ore," after vigorous agitation the metallic particles rise to the surface in a froth; that the proportion thereof varies considerably with different ores and different oils, and so it is necessary to test "to determine which oily substance yields the proportion of froth or scum desired." An example of a particular ore and oil is of oil "say from .02 per cent. to .5 per cent. on the weight of ore," wherein on cessation of agitation "a large proportion of the mineral present rises to the surface in the form of a froth or scum which has derived its power of flotation mainly from the inclusion of air bubbles introduced into the mass by the agitation, such bubbles or air films adhering only to the mineral particles which are coated" with the oil, which has "a preferential affinity for metalliferous matter over gangue." It adds that the minimum of that oil "may be under .1 per cent. of the ore, but this proportion has been found suitable and economical."

The claims are (1) for "oily liquid * * * to a fraction of 1 per cent. on the ore" ; (2) for oleic acid "to 0.02–0.5 per cent. on the ore," and (3) for "a small quantity of oil." These last were held invalid. In upholding the patent the Supreme Court says:

That, "as described and practiced," the process consists "in the use of an amount of oil which is 'critical' and minute as compared with the amount used in prior processes, 'amounting to a fraction of 1 per cent. on the ore,' and in so impregnating with air the mass * * * by agitation * * * as to cause to rise to the surface * * * a froth, * * * which is composed of air bubbles with only a trace of oil in them, which carry in mechanical suspension a very high percentage of the metal." That "it differs so essentially from all prior processes in its character, in its simplicity of operation, and in the resulting concentrate, that we are persuaded that it constitutes a new and patentable discovery." That the facts are not overstated by Liebman that: " The present invention differs essentially from all previous results. It is true that oil is one of the substances used, but it is used in quantities much smaller than was ever heard of, and it produces a result never obtained, before. The minerals are obtained in a froth of a peculiar character, consisting of air bubbles which in their covering film have the minerals imbedded in such manner that they form a complete surface all over the bubbles. A remarkable fact with regard to this froth is that, although the very light and easily destructible air bubbles are covered with a heavy mineral, yet the froth is stable and utterly different from any froth known before, being so permanent in character that I have personally seen it stand for 24 hours without any change having taken place. The simplicity of the operation, as compared with the prior attempts, is startling. All that has to be done is to add a minute quantity of oil to the pulp to which acid may or may not be added, agitate for from 2½ to 10 minutes and then after a few seconds collect from the surface the froth which will contain a large percentage of the minerals present in the ore.' " That the court is convinced "that the small amount of oil used makes it clear that the lifting force which separates the metallic particles of the pulp from the other substances of it is not to be found principally in the buoyancy of the oil used, as was the case on prior processes, but that this force is to be found, chiefly, in the buoyancy of the air bubbles introduced into the mixture by an agitation greater than and different from that which had been resorted to before, and that this advance on the prior art and the resulting froth concentrate so different from the product of other processes make of it a patentable discovery as new and original as it has proved useful and economical." That the court agrees with the House of Lords' decision that the process is not one before described but a new method in which flotation is by the "buoyancy of air bubbles." That tests to determine the necessary "amount of oil and the extent of agitation," and "the range of treatment

within the terms of the claims," satisfy the law; but that, while the patentee "discovered the final step, precedent investigations were so informing that this final step was not a long one, and the patent must be confined to the results obtained by the use of oil within the proportions often described in the testimony and in the claims of the patent as 'critical proportions' 'amounting to a fraction of 1 per cent. on the ore,' and therefore * * * the patent is valid as to claims Nos. 1, 2, 3, 5, 6, 7, and 12, * * * but * * * invalid as to claims 9, 10, and 11."

Those held invalid are those heretofore referred to as (3). It seems clear neither patent nor decision undertakes to say the process depends upon less than 1 per cent. of oil or is inoperative with 1 per cent. or more of oil.

It is true that in the beginning and during the Hyde suit the patentees inclined to so believe, or at least believed better results would be obtained with a fraction of 1 per cent. of oil. Perhaps limited investigation and experience with few ores and oils justified the belief. Indeed, all experience to date, plaintiffs', defendant's, strangers', demonstrates that with any ore and any efficient oil, less than 1 per cent. of oil gives better results, all circumstances considered. The "critical proportions" referred to seems absent, in terms, from the patent, and ought not to be adversely inferred, in disregard of construction in favor of the patentee where the patent is ambiguous. The patent describes oil "considerably reduced," and refers to a "fraction of 1 per cent." by way of example. And though some claims limit oil to such fraction, and a limited range within it, others are for "a small quantity," and for that reason held invalid by the Supreme Court. With the later knowledge of this suit, it is doubted that such would be the decision now. It is to be observed that this limitation of the patent indicates the Supreme Court believed the process might be operative with 1 per cent. and more of oil, and contemplated that this would not defeat the patent, but might affect infringement. If the patent is limited to the use of a fraction of 1 per cent. of oil, that the process can be operated with 1 per cent. and more is not material to validity, though it may be to infringement. For if a patentee limits his claim voluntarily, or because he does not know the extent of his invention, he abandons the excess, and the patent is valid to the extent of the claim. If it be conceded that new evidence might warrant and demand that a trial court hold invalid a patent by the Supreme Court held valid, such evidence must be unequivocal, clear, and convincing, in quality and quantity that inspires confidence and produces conviction that the patent is invalid, and that the Supreme Court would so determine, beyond a reasonable doubt. Not only does it fail here, but it strengthens the conviction that the patent is valid.

[2] The disclaimer, to conform to the Supreme Court's decision that claims 9, 10, and 11 are invalid, was filed 107 days after said decision, and after mandate, but before expiration of the time for rehearing. It was timely filed. In substance it fairly conforms to the language of the decision, disclaiming "from claims 9, 10, and 11 * * * any process of concentrating powdered ores excepting where the results obtained are the results obtained by the use of oil in a quantity amounting to a fraction of 1 per cent. on the ore." The parties differ in its

interpretation, even as they do in respect to the decision. Written words, not oral claims, control. The patent claims included what the patentees were entitled to, and more. The decision pointed out the excess. The patentees disclaim the excess. They can safely rely upon the decision, and a disclaimer conforming to the language of the decision is sufficient. The patent valid, defendant admits infringement from before suit commenced to January 7, 1917, and denies infringement thereafter. During the period of admitted infringement it applied the process to some 1,598,000 dry tons of crushed ore, the tailings from water concentration, of mineral zinc content by yearly averages as follows: 1913, 15.14 per cent.; 1914, 14.14 per cent.; 1915, 13.66 per cent; 1916, 12.89 per cent. Oil used by yearly averages is as follows: 1913, 5.58 pounds; 1914, 2.22 pounds; 1915, 1.49 pounds; 1916, 1.43 pounds. The concentrate grade by yearly averages is as follows: 1913, 47.60 per cent.; 1914, 53.03 per cent.; 1915, 54.62 per cent.; 1916, 53.83 per cent.; and recoveries (apparent) likewise are for 1913, 80.03 per cent.; 1914, 86.08 per cent.; 1915, 90.18 per cent.; 1916, 92.63 per cent. Progress is indicated by leaner ores, less oil, higher grade concentrates, greater recoveries, all coincident with advancing time.

It is noted that the process is responsible for advance in methods, devices, and machines for its operation. To briefly describe defendant's during infringement admitted, the water concentrate tailings, oil added, flowed to the head of a pyramid machine of seven cells in series; each cell containing a revolving perpendicular spindle and horizontal blades, and having two opposed spitzkasten. The agitation was very violent. The tails from each cell flowed by gravity to the cell immediately below, those from the last cell flowing to Callow air cells, which produced froth middlings, returning to the head of the pyramid, and tails to waste. The first three cells of the pyramid produced froth rougher concentrates, which flowed to cleaners, and the other cells produced froth middlings, which returned to the head of the pyramid. The rougher concentrates passed through five cleaner cells for washing. This produced concentrates which flowed to and through five recleaner cells, and tails which returned to the head of the pyramid. The recleaners produced final concentrates, and tails which returned to the head of the cleaner. Commencing January 7, 1917, the defendant's methods are as before, save pneumatic, as well as mechanical, agitation is employed in the lower four cells of the pyramid, some spitzkasten are blocked, an additional cleaner operation is used, and from which for some unexplained reason 8.65 per cent. zinc tails go to waste, and oil in amount 1 per cent. and more on the ore is used. Defendant not very insistently claims results for this latter period are more profitable than for the former; but plaintiffs' analysis (neither denied nor criticized, and beyond both) of defendant's reports and tabulations makes manifest the fact is otherwise to the extent of about $1.75 per ton of ore—an enormous loss on 45,000 tons monthly. There is considerable like testimony in reference to operations by other infringers. However, coming as it does after very large operations, investigations, and experiments of several years, after the Supreme

Court's decision in the Hyde suit, it is incredible that use of 20 pounds of oil per ton results in more profit than 1½ to 4 pounds per ton. If it does, these great concerns would not have waited to discover the fact, and employ it, until after the said decision. Defendant practically admits that it now uses the present amount of oil merely to avoid the patent. It is done, says its counsel in argument, "because the Supreme Court has said it is not at liberty to use less than one-half per cent.," and "out of abundance of caution" it uses "more than 1 per cent." The evidence likewise persuades. If the excess oil were effective and useful, and not inert and useless or harmful, it would be without the claims of the patent, would be of that the patentees abandoned to the public, and would involve no infringement.

Plaintiffs somewhat laboriously argue that though the Supreme Court held that the claim for use of "a small quantity of oil" to produce froth is too broad and so invalid, yet since the court identifies the invention by the "results obtained," though confining it to the "results obtained" by the use of oil "amounting to a fraction of 1 per cent. on the ore," the import of the decision is that, if the results obtained by operation of the process with oil in amount of 1 per cent. and more on the ore are like and the same results obtained with a fraction of 1 per cent. of oil, it is within the patent and is infringement. This is more ingenious than sound, and would deprive the decision of effect. The court does not confine the patent to the *like* or *same* results obtained, but to *the* results obtained, by the use of a fraction of 1 per cent. of oil on the ore. It is believed, however, that the court employs the word "use" in its or the ordinary sense of beneficial service. Patent law is not concerned with the useless, and a valuable result sought is not "obtained" *by*, but *despite*, the use of an excess of an essential ingredient, which excess renders no or ill service. From the evidence it appears the larger part of the oil used by defendant, and all in excess of a fraction of 1 per cent. on the ore, if not inert, is ineffective, wasted, and injurious to the process and results. Before January 7, 1917, defendant used only pine oil, and about 1.43 pounds per ton of ore, with excellent results. Since said date it uses a mixture of 20 to 24 pounds of oil per ton of ore, made up of 18 per cent. of pine oil, 12. per cent. of kerosene oil, and 70 per cent. of fuel oil, with poorer results. The kerosene and fuel oil are petroleums. As before stated, many oils are ineffective to operate the process, and that is because they have not the quality that contributes to bubble making. What this quality consists of, wherein it lies, does not appear. With these ineffective oils, agitation will not produce froth, and so there is no flotation of the metallic particles. One of defendant's witnesses testifies that in the laboratory and plant of the Utah Copper 1,000 oils have been tried, of which but two mixtures give satisfaction. Petroleums seem generally ineffective, by the evidence of both parties, though some of defendant's witnesses testify to sometime successful experiments with them. Incidentally, there is suspicion that with experiments, as with figures, can be done anything for or against, without impropriety in the operator. Some petroleums are used in limited quantities, but

always in combination with a recognized bubble-making oil, and only, it is said, for a somewhat bubble-stabilizing effect. Defendant's present mixture of oil contains more pine oil on the ore than it used alone before January 7, 1917. The other factors the same, it is obvious the excess petroleums in the mixture are responsible for the poorer results.

Defendant uses the patent process, uses plaintiffs' invention of ore concentration by air bubble flotation, uses the same elements in the same combination, in the same way, with the same function, to the same, but poorer, results; and exceeding the patent claims in reference to one ingredient (oil) uselessly, wastefully, and injuriously, and merely with intent to avoid the letter of the patent, does not avoid infringement. The addition of the excess oil no more adds to or changes the process, no more avoids infringement, than would the addition of milk or other useless substance, not a part of the process. The excess oil either exercises no function, or less efficiently exercises the same function in the same way, as the limited oil, and to the same, but poorer, results. To secure to patentees their invention, the law looks quite through mere devices and forms to the substance of things. And if in substance the invention is taken, if the thing that does the work is taken, all devices to evade the letter of the patent avail nothing to escape the consequences of infringement. Neither principle nor authority to the contrary is cited or known to the court.

In the matter of estoppel affecting infringement, it suffices to say neither in pleading nor proof do the elements of estoppel appear. Although the evidence is of great volume and the arguments of relative length, all have been carefully considered, but require no additional reference herein.

The patent is valid in respect to all claims involved. Defendant throughout has infringed, and now infringes, all said claims, save 5, 6, and 7, and decree accordingly.

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes