BUTTE & SUPERIOR MINING CO. v. MINERALS SEPARATION,
Limited, et al.

(Circuit Court of Appeals, Ninth Circuit.    May 13, 1918.)

No. 3081.

PATENTS ⬥328—VALIDITY AND INFRINGEMENT—PROCESS—ORE CONCENTRATION.

   Sulman, Picard and Ballot patent, No. 835,120, for a process of ore concentration by air bubble flotation, while valid as to claims 1, 2, 3, 5, 6, 7, and 12, is limited to a process using any oil or oily liquid having a preferential affinity to metalliferous matter in a proportion amounting to one-half of 1 per cent. or less on the ore, and the use of a greater quantity of oil or of such oily liquid in ore concentration is not an infringement.

   Morrow, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the District of Montana.

Suit by the Minerals Separation, Limited, and others, against the Butte & Superior Mining Company. From a decree for complainants (245 Fed. 577), defendant appeals. Reversed and remanded, with directions.

See, also, 237 Fed. 401.

This is an appeal from the decree of the United States District Court for the district of Montana, sustaining letters patent No. 835,120, issued to Sulman, Picard and Ballot on November 6, 1906, for a process of ore concentration, and adjudging the appellant herein to have infringed the same. The appellees, two British corporations and one domestic corporation, are the legal owners of the title to the patent in suit, and of the rights to profits and damages for infringement thereof. The appellant is a domestic corporation, doing business at Butte, Mont., where the acts of infringement complained of were committed.

The suit was commenced on October 10, 1913, and a preliminary injunction sought. At the hearing on the motion for a preliminary injunction the pleadings and proceedings in the suit of Minerals Separation, Limited, et al. v.

———————

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James M. Hyde, in the United States District Court for the district of Montana, were offered and received in evidence, and are a part of the record herein. That suit was upon the same patent, and the issues were substantially the same as in the present case. The answer of the defendant set up the defense of anticipation and denied infringement. While the cause was at issue, but before trial on the merits, the Supreme Court of the United States rendered its decision in the Hyde Case, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286, holding claims 1, 2, 3, 5, 6, 7, and 12 of the patent to be valid, and claims 9, 10, and 11 to be invalid. The plaintiffs filed a supplemental and amended bill on May 1, 1917, during the trial of the case on the merits, pleading a disclaimer filed by them on March 28, 1917, and charging continued infringement of claims 9, 10, and 11 of the patent, as limited by said disclaimer, and of the remaining claims.

To the plaintiffs' supplemental and amended bill of complaint defendant filed its answer on May 4, 1917, denying infringement and the validity of the patent by reason of lack of novelty and invention; alleged, further, that the patent had become wholly void and invalid by reason of the unreasonable neglect and delay of the plaintiffs to file a proper or any disclaimer in writing to claims 9, 10, and 11, held to be invalid by the Supreme Court in the Hyde Case; alleged, also, an estoppel against the claim of infringement by the use by the defendant of an amount of oil exceeding five-tenths of 1 per cent. on the weight of the ore, basing this defense upon a statement made by one of plaintiffs' counsel in the Supreme Court of the United States, in the Hyde Case, that the invention described in the patent was not reached or practiced until the amount of oil fell to or below five-tenths of 1 per cent. on the weight of ore treated by the process.

Upon the issues thus presented voluminous testimony was taken upon all the questions involved, which, as stated, were substantially the issues in the Hyde Case, restated and reconsidered by the lower court in the present case. The court thereupon entered a decree in favor of the plaintiffs, in accordance with the conclusions of the opinion, holding that the plaintiffs were the owners of the patent in suit; that the processes employed by the defendant, both before and after the filing of the bill of complaint, to and including January 7, 1917, embodied the invention of the patent, and infringed claims 1, 2, 3, 5, 6, 7, and 12 thereof, and claims 9, 10, and 11, as limited by said disclaimer; and that the processes employed by the defendant from the 7th day of January, 1917, down to and through the time of the trial, embodied the invention of the patent, and infringed claims 1, 2, 3, and 12 thereof, and claims 9, 10, and 11, as limited by the said disclaimer. The decree granted a permanent injunction against the further use of such process by defendant, and directed that an accounting be had for the assessment of damages accruing from such use. From that decree the defendant has appealed to this court.

Thomas F. Sheridan, of Chicago, Ill., Frederick P. Fish, of Boston, Mass., J. Edgar Bull, of New York City, J. Bruce Kremer, L. P. Sanders, and Alf C. Kremer, all of Butte, Mont., and Kurnal R. Babbitt, of New York City, for appellant.

Henry D. Williams, Wm. Houston Kenyon, and Lindley M. Garrison, all of New York City, Garret W. McEnerney, of San Francisco, Cal., and Odell W. McConnell, of Helena, Mont., for appellees.

Before ROSS, MORROW, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). Notwithstanding the strenuous contentions on both sides of this litigation, and the very elaborate preparations and able arguments of many distin-

guished counsel, we can but regard the case as a very plain one. To start with, the law is too well established, to require discussion or the citation of authorities, that the patentee's rights under a patent are governed and limited by its valid claims—its specifications being referred to only as illustrative of the true meaning of the claims. It is equally well settled law that the mere result of an invention is not patentable; nor is froth, or scum, or pine oil, or any other kind of oil, or oleic acid, patentable as such.

In their specifications the patentees of the patent in suit declare that their invention "relates to improvements in the concentration of ores, the object being to separate metalliferous matter, graphite, and the like, from gangue by means of oils, fatty acids, or other substances which have a preferential affinity for metalliferous matter over gangue"; but, of the claims of their patent adjudged by the court below to have been infringed by the appellant, not one specifies any particular kind of oil, although the fifth and sixth specify as one of their constituents "a small proportion of oleic acid (which is an acid existing in most fats in combination with glycoral), amounting to 0.02–0.5 per cent. on the ore." And we do not understand it to be contended that the appellant uses any oleic acid in its process.

It is not denied that at the time of the invention in question the affinity of oil for the metalliferous portion of powdered ore, when mixed with water, was well known, as well as the further fact that the agitation of such a mixture with, as well as without, the addition of acid, would carry the metalliferous portions to the surface of the mixture and the gangue to the bottom; certainly those facts could not be successfully denied, in view of the numerous references to the prior state of the art made in the opinion of this court when this patent was last under consideration here, and when the whole patent was by this court held void as lacking invention. 214 Fed. 100, 130 C. C. A. 576. That judgment was, it is true, reversed by the Supreme Court, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286. In doing so, however, the Supreme Court held invalid claims 9, 10, and 11 of the patent, each of which claims was for "a small quantity of oil." So that it is plain the appellees are not entitled to be protected in the use of "a small quantity of oil" of any kind, which, as is obvious, is a wholly indefinite quantity.

In holding claims Nos. 1, 2, 3, 5, 6, 7, and 12 of the patent valid to the extent that it did, the Supreme Court, after pointing out in its opinion that there were many investigators at work in the field to which the process in suit related when the patentees came into it, and that it was while engaged in study of prior kindred processes that their discovery was made, said:

"While the evidence in the case makes it clear that they discovered the final step which converted experiment into solution, 'turned failure into success' [the former patents having used so much oil as to make its cost prohibitive—our observation] (The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154), yet the investigations preceding were so informing that this final step was not a long one, and the patent must be confined to the results obtained by the use of oil within the proportions often described in the testimony and in the claims of the patent as 'critical proportions,' 'amounting to a fraction of 1 per cent. on the ore.' "

Amounting to *a* fraction of 1 per cent. on the ore is very far from saying amounting to *every* fraction of 1 per cent. on the ore. *A* fraction is one thing; *every* fraction is a very different thing. It is obvious, we think, that if the Supreme Court had meant to extend the scope of claims 1, 2, 3, 5, 6, 7, and 12 of the patent to *1 per cent.* of oil on the ore, as is here contended by the appellees, it would not have said anything about any *fraction* of 1 per cent.—certainly there would have been no necessity for doing so, and certainly the use of such specific language as it employed without a purpose cannot be justly imputed to that great tribunal. That the "critical proportions" "amounting to a fraction of 1 per cent. on the ore," so protected by the Supreme Court in its decision, does not include *every* fraction of 1 per cent. on the ore, is, we think, very clearly shown by the same opinion, where, after describing the prior state of the art, the court said:

"Into this field of investigation at this state of its development came the patentees of the patent in suit. They were experienced metallurgists of London, of inventive genius and with financial resources, and they entered upon an investigation of the processes of oil concentration of ores, which was continued through several years, and consisted of a very extended series of experiments, in which the quantities of oil, of water, and of acid used, and the extent and character of the agitation of the mass under treatment resorted to, were varied to an almost unparalleled extent as to each factor, and the results were carefully tabulated and interpreted. It was while pursuing a comprehensive investigation of this character, having, as the evidence shows, the special purpose in mind at the time to trace the effect on the results of the process of a reduction to the vanishing point of the quantity of oil used, that the discovery embodied in the patent in suit was made. The experimenters were working on the Cattermole 'metal sinking process' as a basis, when it was discovered that the granulation on which the process depended practically ceased when the oleic acid (oil) was reduced to about five-tenths of 1 per cent. 'on the ore.' It was observed, however, that, as the amount of oleic acid was further reduced and the granulation diminished, there was an increase in the amount of 'float froth' which collected on the surface of the mass, and that the production of this froth reached its maximum when about one-tenth of 1 per cent., or slightly less, 'on the ore,' of oleic acid was used. This froth, on collection, was found to consist of air bubbles, modified by the presence of the minute amount of oil used, and holding in mechanical suspension between 70 per cent. and 80 per cent. of the total mineral content of the mass treated. It was promptly recognized by the patentees that this froth was not due to the liberation of gas in the mass treated by the action of the dilute acid used, and its formation was at once attributed in large part to the presence of the air introduced into the mixture by the agitation, which had been resorted to, to mix the oil with the particles of crushed ore, which air, in bubbles, attached itself to the mineral particles, slightly coated as they were with what was necessarily an infinitesimal amount of oil, and floated them to the surface. The extent of the agitation of the mass had been increased as the experiments proceeded, until the 'series of Gabbett mixers, fitted with the usual baffles, were speeded at from 1,000 to 1,100 revolutions per minute.' A careful consideration of the record in this case convinces us that the facts with respect to the process of the patent in suit are not overstated by the plaintiffs' witness, Adolf Liebman, an expert of learning and experience, when he says in substance: 'The present invention differs essentially from all previous results. It is true that oil is one of the substances used, but it is used in quantities much smaller than was ever heard of, and it produces a result never obtained before. The minerals are obtained in a froth of a peculiar character, consisting of air bubbles which in their covering film have the minerals imbedded in such manner that they form a complete surface all over the bubbles. A remarkable fact with regard to this froth is

that, although the very slight and easily destructible air bubbles are covered with a heavy mineral, yet the froth is stable and utterly different from any froth known before, being so permanent in character that I have personally seen it stand for 24 hours without any change having taken place. The simplicity of the operation, as compared with the prior attempts, is startling. All that has to be done is to add a minute quantity of oil to the pulp, to which acid may or may not be added, agitate for from 2½ to 10 minutes, and then after a few seconds collect from the surface the froth, which will contain a large percentage of the minerals present in the ore.' It is not necessary for us to go into a detailed examination of the process in suit to distinguish it from the processes of the patents relied on as anticipations, convinced as we are that the small amount of oil used makes it clear that the lifting force which separates the metallic particles of the pulp from the other substances of it is not to be found principally in the buoyancy of the oil used, as was the case in prior processes, but that this force is to be found, chiefly, in the buoyancy of the air bubbles introduced into the mixture by an agitation greater than and different from that which had been resorted to before, and that this advance on the prior art and the resulting froth concentrate so different from the product of other processes make of it a patentable discovery as new and original as it has proved useful and economical."

Nothing, it seems to us, can be clearer from the foregoing quotations from the opinion of the Supreme Court than that it did not intend to extend the monopoly of the patent in suit to the use of 1 per cent. of oil on the ore; for it, in effect, thereby distinctly declares and adjudges that the discovery of the appellee "experimenters" only rose to the dignity of invention when they ascertained that the desired results could be and were obtained by the use of five-tenths (one-half) of 1 per cent. of oil on the ore, with still better results as the quantity was reduced, to the vanishing point at less than one-tenth of 1 per cent. The quantity of oil that gave birth to the invention—five-tenths (one-half) of 1 per cent. on the ore (at which point no more granulation exists)—to the lesser and extreme limit of the minute quantity (less than one-tenth of 1 per cent.) at which the desired result ceases are the "critical proportions" "amounting to $a$ (italic ours) fraction of 1 per cent. on the ore," to which the appellees' patent is "confined" by the Supreme Court, as we understand its opinion.

And that is just what appears from the present record was the contention of the present appellees before the Supreme Court on the argument of their appeal from the judgment of this court holding that there was no invention in what they did; for it is undisputed that on the argument of that appeal this colloquy occurred between two of the justices and two of the attorneys for the then appellants and the present appellees:

"Mr. Justice McReynolds: I would like to ask you when in this process of reducing oil your invention came into existence.

"Mr. Kenyon: At about one-half of 1 per cent. of oil.

"Mr. Justice McReynolds: Before you got to the one-half of 1 per cent. did you have any invention?

"Mr. Kenyon: We were passing from the region of Cattermole, which was a distinct—

"Mr. Justice McReynolds: I want to know when your invention came into existence.

"Mr. Kenyon: This invention was not reached, I should say from those figures, until about 0.5—that is one-half of 1 per cent.—of oil was reached.

"Mr. Justice McReynolds: At 1 per cent. you had no invention?

"Mr. Kenyon: No.

"Mr. Justice McReynolds: At one-half of 1 per cent. you did have invention?

"Mr. Kenyon: It began to come; remote, but it began to come. At 0.3 of 1 per cent. the flow vastly increased. At 0.1 of 1 per cent. the flow again vastly increased.

"Mr. Justice McReynolds: When this flow is more than one-half of 1 per cent. of oil it does not infringe?

"Mr. Kenyon: It does not infringe.

"Mr. Justice Pitney: What have you to say in answer to what Mr. Scott said the other day, to the effect that 1.8 per cent., or perhaps more, of oil would give the same result with increased agitation?

"Mr. Williams: Absolutely no.

"Mr. Kenyon: It would not.

"Mr. Justice Pitney: I understood him to say so yesterday, and I supposed there was something in the record to justify it.

"Mr. Kenyon: Nothing; that will be a part of my argument."

It results, from the views above expressed and from the similar ones expressed in the concurring opinion of Judge HUNT, that the decree appealed from must be and is reversed, and the case remanded, with directions to the court below to so modify its decree as to accord with the opinions of the majority of this court—the appellant to recover its costs on this appeal.

HUNT, Circuit Judge (concurring). I will briefly state the ground upon which my concurrence rests:

The Supreme Court, in sustaining the claims, carefully noted those which were limited to a fraction of 1 per cent., and the decision explicitly confined the patent to the results obtained by the use of oil within the proportions often described in the testimony and in the claims. Claims 1, 2, and 3 use the language, "amounting to a fraction of 1 per cent. on the ore." Claims 5, 6, and 7 express amounts, percentages on the ore. Claim 12 uses the words of limitation, "amounting to a fraction of 1 per cent. of oil on the ore." Claims 9, 10, and 11 make no reference to a fraction of 1 per cent., but do contain the words, "a small quantity of oil."

The essence of the invention was in the use of this extremely small fraction of 1 per cent., and the Supreme Court, while sustaining the fraction of 1 per cent. claims, held invalid the small quantity claims, 9, 10, 11, because they were too broad. No monopoly could be given on the use of a small quantity of oil for that was old. It was new, however, to avoid the use of larger quantities. The patent must be confined to the use of critical proportions. Now, keeping in mind that by the decision the court has limited the invention to the critical proportions often described by the testimony and in the claims, we naturally ask: What are the critical proportions described in the specifications? Page 1, line 79, of the specification says:

"To this is added a very small proportion of oleic acid (say from 0.02 per cent. to 0.5 per cent. on the weight of the ore)."

And on line 96 we have:

"The minimum amount of oleic acid which can be used to effect the flotation of the mineral in the form of froth may be under 0.1 per cent. of the ore, but this proportion has been found suitable and economical."

We thus have given to us one-half of 1 per cent. or less as the critical proportion described—preferably one-tenth of 1 per cent. is to be used.

We also ask: What is the evidence wherein there is often described the "critical proportion"? A summary of it is that it is very nearly one-tenth of 1 per cent. or two-tenths of 1 per cent. as may be required for particular ore. All through the evidence it appears that minute and critical amounts of oil are to be used as necessary to make the process successful. From one pound of oil to the ton of ore (five-hundredths of 1 per cent.) to four pounds per ton (two-tenths of 1 per cent.) were the limits in practical work as stated by witnesses.

Again, when counsel had the colloquy (quoted in the opinion of Judge ROSS) with the Supreme Court, the guiding thought evident in the mind of the inquiring justices was to stamp precision upon the point when invention in the process began to appear. With apparent definite purpose of meeting the interrogatories, plaintiff told the court that "invention" began to come when in the descending uses of percentages of oil as small a quantity as five-tenths of 1 per cent. was used, and was first present when three and two-tenths of 1 per cent. was used. Of course, a court should cautiously consider a response often quickly made by counsel in answer to questions put from the bench lest an injustice may follow by attaching undue weight to an isolated argumentative answer. But in this matter we are earnestly trying to gather the scope and accurate meaning of the expressed thought of the court. We may therefore refer to the fact that the exact position of the plaintiff as to the invention was called for, not once, but twice, not generally, nor indirectly, but positively, simply and unequivocally. Hence, in the controversy as to the true interpretation of the opinion the questions put and answers given may be fairly resorted to, not as conclusive at all, but as aids toward a better understanding of the statement of the limitations of the claims of the patent and of the definition of the invention included in its language.

Nor do I think there is ground for saying that discrimination was had between known oils—whether vegetable, mineral, or animal. To oily liquids which have a "preferential affinity to metalliferous matter" must the plaintiffs be held, and in using kerosene or fuel oil defendants are but employing oils which the patents authorize the use of; and when defendants use proportions beyond the critical ones of oil—not oleic acid, but other oils—they are not infringing. Oils doubtless vary in being adaptable for use. Some will probably secure more froth than others, and oil formulæ may in their ingredients depend upon the particular ore to be treated and upon the economic relationship to the problem under solution. But the froth developed in using the minute quantities of oil is, I think, essentially of a character like the froth shown when different quantities of oil are used—the difference being largely by reason of a special quantity or kind of oil or the special extent of the agitation applied. The experiments made before us prove this.

In the Cattermole process the froth was held to be distinguishable from the froth produced in the patented process of the critical pro-

portion of oil by the fact that certain remarkable and great results come from the use of the critical proportion which were not obtained when the quantity used in the Cattermole process was employed. By using the critical proportion of oil as defined, patentees get the maximum froth. They have discovered a process—not a froth—and the process is limited to the use of oil in the specified critical proportion.

The sequel of these views is that, inasmuch as defendants keep out of the limits made for the plaintiff by the decision of the Supreme Court by using more than the critical proportion, they do not use plain-tiff's process.

MORROW, Circuit Judge (concurring in part and dissenting in part). I concur in the opinion of the majority of the court that the decree should be reversed, but I do not concur in the direction that the bill be dismissed. I am of opinion that the use of an oil or oily liquid in defendants' separation process in a quantity not amounting to more than a. fraction of 1 per cent. on the ore is within the express terms of claims 1, 2, 3, and 12 of plaintiffs' patent, and is an infringement of such patent. But I am of opinion that the use of oil or oily liquid in a quantity amounting to more than a fraction of 1 per cent. on the ore is not within the terms of claims 1, 2, 3, and 12, and is therefore not an infringement upon plaintiffs' process, and that a decree should be entered accordingly.

The direction of the Supreme Court in Mineral Separation, Ltd., v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286, is that:

"The patent must be confined to the results obtained by the use of oil with-in the proportions often described in the testimony and in the claims of the patent as critical proportions, amounting to a fraction of 1 per cent. on the ore."

The term "critical proportions" is not used in the claims of the patent, but such proportions were described in the testimony in the Hyde Case as the application of a small but exact quantity of oil to different ores and always within the range of the treatment of "a fraction of 1 per cent. on the ore," never to the treatment of different ores within the range of "one-half of 1 per cent.," except in the use of oleic acid and that upon certain ores such as Broken Hill ores. The application of the term "critical proportions" in the use of oil on ores generally within a range of "one-half of 1 per cent." was discovered by counsel for appellant in this case, and so far as appears from the record was revealed to the public for the first time in this court.

The colloquy between Mr. Justice McReynolds and Mr. Kenyon, counsel for appellant in the Supreme Court in the Hyde Case referred to by Judge ROSS in his opinion related to the use of oleic acid on Broken Hill ores, concerning which I do not understand that there is any controversy. I think the direction of the Supreme Court that "the patent must be confined to the results obtained by the use of oil within the proportions * * * 'amounting to a fraction of 1 per cent. on the ore,'" means just what it says, and that within such proportions the process described in the patent is held by the Supreme Court to be a valid discovery protected by the specifications and claims.

numbered 1, 2, 3, and 12. The Supreme Court does not say that the patent must be confined to the oleic acid claims (claims 5, 6, and 7), nor does it say that the other claims of the patent must be confined to the use of oil in the fraction mentioned in those claims. Had the Supreme Court intended that the scope of the patent should be confined to the use of oil in the proportion not to exceed one-half of 1 per cent. on the ore, it would certainly have said so in so many words, and would not have left it to be inferred that the patent must be confined to results obtained by the use of oil in such proportions as are limited in claims 5, 6, and 7. For what purpose does the court hold claims 1, 2, 3, and 12 valid? Manifestly, because these claims provide for the use of oil in the proportions "amounting to a fraction of 1 per cent. on the ore"; that is to say, upon ores generally.

The specifications mention the fact that the ores were not all alike, and that different ores may require the use of different proportions of oily material in order to secure the desired separation of metalliferous matter from the gangue by the production of a froth. The Supreme Court commenting upon this variation in the requirements of the process said:

"Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of substances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows."

The use of oleic acid on Broken Hill ore was the oil and the ore of the discovery, and the proportion of the oil used is described in claims 5, 6, and 7, but how about the use of other oils on other than Broken Hill ores? The proportions required for oleic acid on Broken Hill ores had been determined by actual tests, but other oils and other ores had not been fully tested and the application of the process might require a different proportion of oily material upon a different class of ores. To meet such a contingency, claims 1, 2, 3, and 12 call for the use of an oil or oily liquid "amounting to the fraction of 1 per cent. on the ore." Furthermore, in declaring claims 9, 10, and 11 invalid, the Supreme Court clearly did so because such claims were not confined to the use of oil "amounting to a fraction of 1 per cent. on the ore." The claim was for the use of "a small quantity of oil," which might be a quantity more than "a fraction of 1 per cent. on the ore."

The validity of the other claims in controversy having been sustained upon their limitation of the use of oil within the proportion "amounting to a fraction of 1 per cent. on the ore," it followed that claims 9, 10, and 11 were held invalid because they were not so confined, and were therefore too broad. The disclaimer accordingly disclaims from claims 9, 10, and 11 of the patent "any process of concentrating powdered ores, excepting where the results obtained are the results ob-

tained by the use of oil in a quantity amounting to a fraction of 1 per cent. on the ore." Such language was strictly in accordance with the decision of the Supreme Court, and I think a sufficient rejection of the excess from the invention claimed, leaving the patent in the form limited by the opinion of the Supreme Court.

With respect to the objection that the disclaimer was not filed in time, the mandate of the Supreme Court became effective January 13, 1917, decreeing the patent to be invalid as to claims 9, 10, and 11, but valid as to the other claims in issue. On March 28, 1917, the plaintiffs filed their disclaimer, some time before the right to petition for a rehearing in the Supreme Court had expired. Considering the importance of the procedure to be followed, the residence of the patentees in another country, and the consequent delay in communication, the date of filing was not unreasonably delayed.