## ROSEMARY MFG. CO. v. HALIFAX COTTON MILLS, Inc.

(Circuit Court of Appeals, Fourth Circuit. May 1, 1923.)

No. 1945.

Patents &#x21DD;150—Disclaimer striking out reissue matter and narrowing original held ineffective.

A disclaimer purporting to strike out everything which a reissue patent added to patent and proceeding to narrow the original must be held ineffective, if such a disclaimer can ever be upheld, unless there is no question that there is an invention and that the claims as modified by the disclaimer accurately define its character and its scope.

Appeal from the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Action by the Rosemary Manufacturing Company against the Halifax Cotton Mills, Incorporated. Decree for defendant, and plaintiff appeals. Affirmed.

---

&#x21DD;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

William W. Dodge, of Washington, D. C., and Robert Fletcher Rogers, of New York City (Caskie & Caskie, of Lynchburg, Va., on the brief), for appellant.

Melville Church, of Washington, D. C. (Coleman, Easley & Coleman, of Lynchburg, Va., on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and ROSE, then District Judge.

ROSE, Circuit Judge. This patent cause has some features out of common. In July, 1915, the appellant, the plaintiff below, brought suit against the defendant, appellee here, alleging the infringement of reissue No. 12,159 of letters patent No. 772,248 granted March 10, 1903, to one Samuel F. Patterson. The case moved along with the deliberation characteristic of patent litigation until, about three years and a half later, this court affirmed a decree below dismissing plaintiff's bill. We held the claims of the patent in suit were invalid because they clearly covered more than Patterson had invented, if, in fact, he had invented anything, as to which, under the circumstances, it was unnecessary to inquire. 257 Fed. 321, 168 C. C. A. 405. The patent as it was then before the court purported to cover the combination of an automatic weft replenishing loom with a Jacquard attachment. Both the automatic loom and the Jacquard were old, and the idea of combining the two was far from new. It followed that Patterson's invention, if there was one, was necessarily confined to the particular way in which he had combined the loom and the attachment. The law required him to tell and specifically to claim what that was. That he had not done. Our opinion was handed down January 7, 1919. A little less than three months thereafter, to be exact, on March 31, 1919, the plaintiff filed in the Patent Office what it says was a disclaimer. In order to get a clear idea of precisely what was attempted thereby, it is necessary to understand why the reissue formerly in suit was asked for and what it accomplished. In its original form, the patent might perhaps have been construed as requiring one element of the combination to be a loom in which the automatic weft replenishing devices were of the same general character as those found in the Draper Northrop machines. The reissue was avowedly intended to broaden the already broad statement of invention by adding to the description certain statements, which, in substance, declared that the invention covered the automatic replenishing or renewal of the weft thread supply by any known form of mechanism when combined with the other features set forth. Three broad claims were added to the three of the original patent, which latter were retained in the reissue unaltered except as to the order of statement in the second of them. The disclaimer purported to strike out everything which the reissue had added to the original patent. It furthermore undertook to limit each of the original three claims.

As the plaintiff in this case has not relied on claim 3, it is unnecessary to discuss the effect of the disclaimer upon it. The two claims here in suit, in the form the disclaimer attempts to put them, are as follows; the portions in italics being added by it:

(1) "In combination with the weaving mechanism proper of a loom, an automatic mechanism for supplying weft or filling to the shuttle; Jacquard mechanism for controlling the harness of the loom; and intermediate connection between such mechanism, substantially as described; *when the weaving mechanism recited in such claim comprises a lower or picker shaft and a crank shaft geared together; both of said shafts being provided with cranks; and when the intermediate connections between the several mechanisms as recited in said claim include rods or pitman connecting cranks of the respective shafts with the Jacquard mechanism and the lay or lathe of the loom, respectively; and when, in consequence of breakage or failure of the weft thread, the weft fork brings into action parts which position in the path of a horn or projection carried by the lay or lathe, a notched block carried by the ejector so as to bring about through the movement of the lay or lathe, a movement of the ejector and a consequent forcing of a filled cup, bobbin or spindle from the magazine or battery into the shuttle of the loom, thereby replenishing the weft and ejecting the cup, bobbin or spindle."*

(2) "In combination with the weaving mechanism proper of a power loom, Jacquard mechanism for controlling and actuating the harness thereof: a magazine or battery for containing a supply of filled bobbins or spindles; mechanism for automatically ejecting an empty bobbin or spindle from the shuttle and delivering a filled one thereto; and connections substantially such as shown and described between said mechanisms; *when the weaving mechanism comprises a picker shaft and a crank shaft geared together and both provided with cranks; and when the connections recited in this claim comprise rods or pitman connecting cranks of the respective shafts with the Jacquard mechanism and the lay or lathe respectively."*

So soon as the disclaimer had been filed, plaintiff asked us to reopen the case. We declined to do so, but without prejudice to its right to file a supplemental bill below. Subsequently, we affirmed an order of the learned District Judge refusing to receive such a bill. 266 Fed. 363. Our action in so doing was based in part upon the fact that pending the appeal to us, the plaintiff had by original bill instituted the instant cause. By stipulation, the suit was resubmitted upon the testimony taken in the case decided now more than four years since. Once more the bill was dismissed below, and the controversy is now here. Defendant insists that the plaintiff cannot accomplish by disclaimer what it has attempted to do. The disclaimer relates to a reissue and not to an original patent. As already pointed out, it undertakes to do two things. It strikes out all that the reissue put in and then narrows the claims of the original. By elimination, it restores the patent to its original form, for the change in the order of statement in the second claim does not seem to have been of any more legal significance than the six words in which alone the reissued patent in McMurray v. Mallory, 111 U. S. 97, 109, 4 Sup. Ct. 375, 382 (28 L. Ed. 365), differed from the original, and in which it was said:

"The purpose of the disclaimer and its effect, if valid, was to abandon the reissued patent and resume the original. We are of opinion that this could not be done by a disclaimer. The original patent had been declared on the oath of the patentee to be invalid and inoperative. It had been surrendered and canceled and reissued letters patent granted in its place. It is not competent for the patentee or his assignees, by merely disclaiming all the changes made in the reissued patent, to revive and restore the original patent. This could be done only, if it could be done at all, by surrender of the reissued patent and the grant of another reissue."

That, in the instant case, the disclaimer attempts to do, not only what the Supreme Court says cannot be done, but something more; does not,

it is said, give it a validity which it would not otherwise have had. The disclaimer here does not stop with restoring the patent to its earlier phraseology. That it does, but it then proceeds to disavow or rather to qualify some of the language of the original. In other words, the reissue broadened the patent. The disclaimer struck out all the additional breadth thereby given and proceeded to narrow the original. It is argued that it is as if the patent as first issued covered 180 degrees of a complete circle. The reissue extended its range to 225 degrees, and the disclaimer reduced it to 135. If a disclaimer could not have taken from it the 45 degrees added by the reissue, is it any more effective because it does not stop with subtracting that 45 but takes off another 45 as well? The broad language of McMurray v. Mallory, supra, might well sustain this contention of defendant. It is, however, possible that the law there laid down should be limited to cases in which it is attempted by a disclaimer to restore a claim which was in the original patent but was omitted from the disclaimer. Walker on Patents, § 201. In the subsequent case of Yale Lock Co. v. Sargent, 117 U. S. 536, 553, 6 Sup. Ct. 934, 943 (29 L. Ed. 954), it was said: .

"That the invalidity of a new claim in a reissue does not impair the validity of a claim in it which is only a repetition and separate statement of a claim in the original patent * * * and that, where a defendant has infringed such a restated valid claim of a reissue, the plaintiff, on filing a disclaimer of the new and invalid claims of the reissue, may have a decree, without costs for the infringement of such valid claim."

Though the form in which the disclaimer before us is cast is somewhat unusual, the plaintiff insists that it is by no means unprecedented. Tuck v. Bramhill, 24 Fed. Cas. 259, No. 14213; Marconi Wireless Telegraph Co. v. De Forest, 243 Fed. 560, 156 C. C. A. 258; Butte & Superior Mining Co. v. Minerals Separation Limited, 250 Fed. 241, 162 C. C. A. 377. It is true that in the above cases, and very likely in a number of others, the patentee limited his claims by disclaiming them "except when" they were used in connection with other elements set forth in the disclaimer. In none of them which have come to our notice, no matter how phrased, Seiberling v. John E. Thropps, Sons Co. (C. C. A.) 284 Fed. 746, possibly excepted, did the patentee seek to modify his former claims by incorporating in them so many additional elements as the plaintiff has here done. The disclaimer in Butte & Superior Mining Co. v. Minerals Separation, Ltd., supra, was of any process of concentrating powdered ores, "excepting where the results obtained are the results obtained by the use of oil in a quantity amounting to a fraction of 1 per cent. of the ore." 250 Fed. 249, 250, 162 C. C. A. 378. It was a notably simpler disclaimer than the one now under consideration, but, even so, the Supreme Court said its "wording borders on finesse." It, however, was clearly intended to limit the claims effected by it to the rights legitimately obtained under claims which, in a prior suit, the Supreme Court held valid and was therefore deemed sufficient to meet the statute. Minerals Separation, Ltd., v. Butte & Superior Mining Co., 250 U. S. 336, 354, 39 Sup. Ct. 496, 63 L. Ed. 1019. In Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968, the disclaimer was

confined to certain statements of the specifications. The claims were left untouched, although, of course, the omission had the effect of narrowing their construction. In one of the most recent cases, Permutit Co. v. Harvey Laundry Co. (D. C.) 274 Fed. 937, Id. (C. C. A.) 279 Fed. 713, where the patentee originally claimed a process in which water flowed through his apparatus either upwardly or downwardly, the disclaimer limited it to those cases in which the water took a downward course.

The greater number and complexity of the added elements are, however, by no means the only respect in which plaintiff's disclaimer differs from those of the reported cases. The one in Minerals Separation, Ltd., v. Butte Superior Mining Co., supra, is quite typical of every other which, so far as we know, has received the favorable consideration of the courts. In that case, the Supreme Court had held that there was invention in reaching the desired result by the use of oil in quantities of less than 1 per cent. All the disclaimer did was to introduce this limitation in such of the claims as had previously been more broadly phrased. In Seiberling v. John E. Thropps Sons Co., supra, the disclaimer, while in form complex, was in the view of the majority of the court quite simple.

In the instant case, we held that Patterson had no right to monopolize the combination of the automatic weft replenishing loom with the Jacquard attachment. We said if there was any invention, it must lie in the particular ways and the special devices by which he had brought that combination about, and by its disclaimer, plaintiff says it has limited itself to them. What these were had, however, not been stressed in argument, nor did we feel called upon to consider them. When the application for the original patent and for the reissue were before the Patent Office, the invention was said to consist essentially in the combination of the power loom equipped with an automatic weft replenishing device and the Jacquard attachment, irrespective, at least to a large degree, of how that combination was effected and made operative. Of course, the Patent Office was not called upon and did not and could not take any action upon the disclaimer, so that in consideration of the claims as they are now before us, we have not the benefit of the study of them by the Patent Office. Moreover, the testimony in the record is almost altogether confined to the patentability of the broad claims of the reissue, and neither examination nor cross-examination was directed with any particularity to the features in which invention is now said to be. In this respect, the situation with which we are confronted is very unlike that of the cases upon which plaintiff relies.

The plaintiff, if it had seen fit, instead of filing a disclaimer might have applied for a second reissue. That would have had some manifest advantages. The claims could have been altogether rewritten, and, it is quite possible, might thereby have been shortened and clarified. Both their form and their substance would have been subjected by the experts of the Patent Office to that critical examination, successful emergence from which raises a presumption of validity. But the reasons against seeking a reissue were as a practical matter con-

clusive, from plaintiff's standpoint. A surrender of the patent would extinguish all existing rights of action under it. When the disclaimer was filed, it had less than twelve months to run. The piloting of a reissue through the Patent Office would certainly have taken weeks and perhaps months. When it was granted, any possible right of action against the defendant would doubtless have been worth far less than its successful assertion would have cost. Plaintiff's only hope was in a disclaimer. Plaintiff naturally and properly stresses the declaration of the Supreme Court that the power to disclaim is a beneficial one and ought not to be denied except where it is resorted to for a fraudulent or deceptive purpose. Sessions v. Romadka, 145 U. S. 29, 40, 12 Sup. Ct. 799, 36 L. Ed. 609. That case was free from the difficulties present here. All the claims but one were disclaimed and that was left unaltered. The character of the disclaimer in Carnegie Steel Co. v. Cambria Iron Co., supra, in which the same language as to disclaimers was used, has already been pointed out.

To sustain the disclaimer now under consideration will require us to go farther than, so far as we know, any court has ever before gone. It is certain that in the instant case a reissue would have been far more appropriate than a ·disclaimer and would have relieved the situation of many embarrassments now present. If a patentee may, under such circumstances, resort to the extreme "finesse," to use the phrase of the Supreme Court, here displayed, the door would be opened wide to those who would seek to use disclaimers for "fraudulent or deceptive" pur-. poses.

It is not going too far to say that if such disclaimer can ever be upheld it will be only when there is no question that there is an invention and that the claims as modified by the disclaimer accurately define its character and scope. In the case before us, not only is there an absence of any Patent Office consideration of what the invention was, if there was any, but we have not had the benefit of the testimony of the witness who upon plaintiff's theory knew most about it. The original patentee has not testified, although he was alive, in good health, accessible, and apparently pecuniarily interested in the plaintiff. When the depositions in the first case were taken, the plaintiff thought the invention consisted in the combination broadly considered, and it was shown that so far as the witnesses for the plaintiff knew, the patentee was the individual who had conceived the possibility of bringing that about. At that time, however desirable his testimony might have been, it was far from necessary. The present situation is different. Invention is now said to lie, not in the combination independently of how it is effected, but in the peculiar mechanism by which the loom and the attachment are brought into working unity. There is literally almost no evidence in this record as' to any part the patentee had or could have had in devising it. One of the evidences of invention relied upon by the plaintiff is that it took the patentee's brother from 30 days to 5 months according to the varying recollections of the witnesses to put together the Draper Northrop loom and the Jacquard attachment, although he had at his command the facilities and the trained experts of the Crompton Knowles shops. It is said it would have taken but 1

or 2 days to put such an attachment upon an old fashioned loom. The suggestion is that the way of effecting the new combination was far from simple and obvious. During all that time, the inventor at most paid but a couple of visits to Providence, and no one testifies to anything specific he did, said, suggested, or directed on either of those occasions. A number of letters passing between him and his brother and between him and other persons at or about this time have been put in evidence, but it is noteworthy that in none of them coming from him are to be found any instructions or advice as to how the work was to be done. His brother, who testifies that at his request he went to Providence to put the loom and the attachment together, does not tell us what he was told other than he was to combine them. It is true that in general terms, he says that all the suggestions to meet the practical difficulties which in Providence, from time to time, developed themselves, came from his brother; but how these were made or communicated he did not state. The witness referred to a sketch the patentee gave him, but does not exhibit it. The lapse of time might well account for its nonproduction, but it is not so clear why no attempt is made to tell us in any detail what it showed.

The real argument that the patentee invented anything is that so soon as the Draper Northrop loom came on the market, the desirability of putting a Jacquard attachment upon it was obvious, and yet five years or thereabouts elapsed before any one found out how it could be done. It is easy to understand why the owners of the Draper Northrop patent did not turn their attention to it. They were fully taken up in getting their great invention before the trade and in overcoming the various practical difficulties which always attend the introduction of new machinery. The demand for the new looms was very large. Within six years 70,000 of them were sold. The call for plaintiff's combination to be used for any or all other purposes than the manufacture out of cotton, of damask table cloths, and napkins has been almost negligible. Any one who wanted them could obtain them from either the Draper or the Crompton Knowles Company. The two together, up to 1916, had sold but 306 of them. For the making of table damask the plaintiff, its sole licensee, and the defendant together use a total of less than 1,300. There are said to be several other infringers; the number of looms which they have is not stated; but as the plaintiff has not thought it worth while to proceed against them, it is not likely that any of them employ very many of the patented devices. On the whole, it does not seem probable that as many as 2,000 of them, whether for restricted or unrestricted use, have ever been called for. That number is, of course, considerable and testifies to the usefulness of the combination for certain purposes, but the contrast between the sale of 70,000 of the Draper Northrop looms and the total output of the plaintiff's combination, licensed and unlicensed, sufficiently explains why the owners of the Draper Northrop patent did not in the years immediately succeeding its invention give much thought to equipping it with the Jacquard attachment. Plaintiff has offered the testimony of one highly competent witness, that before plaintiff's patentee succeeded in putting the two machines together, skilled men commanding ample

288 F.—44

resources had unsuccessfully tried to do the same thing. A Mr. Davenport, a Draper Northrop expert, had in 1898 gone to Mulhouse in Alsace to further the introduction of the Draper Northrop loom in Europe. For some 2½ years he remained there with the Société Alsacienne de Construction Mechaniques overseeing the placing of the loom in France, Germany, and the Low Countries. For some 8 or 10 months of that time, the witness and one Bicking, the Jacquard expert of the Alsatian Company, at times worked on a scheme of equipping the new loom with the Jacquard attachment. So far as he recalls, one machine was made to operate in the experimental room, but the idea was eventually dropped as being commercially impractical. That is all we are told about it. What were the difficulties in bringing about the combination are not stated. Curiously enough, the witness on his return to America entered the employ of the Crompton Knowles Company and was there when the younger Patterson was superintending the construction of the combination now under consideration. He appears to have been in touch with the work. He says he was skeptical of its success, but he stops there. If his Alsatian experiments had been gone into earnestly enough to have engaged his attention seriously, it might be supposed that fresh as he then was from them, he would have been intensely interested in what Patterson was trying to do and would still be able to recall in what respects the latter's approach to the problem differed from that of himself and his European colaborer. Mr. Davenport's evidence, interesting as it is, is not over helpful in determining whether there was or was not invention in the particular mechanical details used by the plaintiff and set forth in its claims in suit, as they have been modified by its disclaimer.

Much is said by the plaintiff as to the importance of the invention in increasing production, lowering cost, and improving quality. The file wrapper of the application for the original patent suggests that the emphasis put by Patterson upon these matters may have played a large part in inducing the Patent Office to change its position from rejection to allowance. The statements then made were, of course, ex parte. But an analysis of the testimony in the record demonstrates that the large part of these results, if not all of them, are attributable to the Draper Northrop loom in the devising of which Patterson had no part. The utmost of his contribution to the industry is the putting of that loom at the service of those weavers who wanted to use the Jacquard attachment.

The defendant put on the stand men of long and wide experience in the industry to testify that to combine the loom with the attachment was easy. It is quite possible plaintiff may be right in saying that this is but wisdom after the event; but upon this record, it is quite impossible for us to feel sure of it. Plaintiff stresses the presumption of invention which it says the patent raises. In view of the history of the claims in suit as the disclaimer has recast them, any such presumption, if it exists, is purely technical. It rests on no substantial basis of fact. It has no support from a Patent Office examination and allowance of the claims as they now stand. To sum up the whole matter, the record leaves three things doubtful: First, whether it re-

quired invention to put a Jacquard attachment upon a Draper Northrop loom. Second, if it did, are the claims in their present form limited to what was invented? Third, what part, if any, did Patterson, the patentee, have in planning the mechanical details which the present claims seek to cover? Under such circumstances, a court would not be justified in giving effect to so unusual a disclaimer as that here relied upon.

It follows that the learned judge below made no mistake in dismissing the bill, and his decree must be affirmed.

KNAPP, Circuit Judge, who took part in the hearing of this case, died before the opinion was announced.