## WOLF MINERAL PROCESS CORPORATION v. MINERAL SEPARATION NORTH AMERICAN CORPORATION.

(District Court, D. Maryland. August 8, 1925.)

No. 286.

**1. Master and servant ⬅62—Evidence held not to show fraud of inventors of flotation process for separating ores as against client employing them.**

In suit to establish equitable ownership of patent for flotation process of ore separation, evidence *held* not to warrant finding that patentees, while employed as chemists by plaintiff, fraudulently concealed from him results of experiments culminating in patent, but that process was discovered in pursuing investigations independent of such employment.

**2. Patents ⬅328 — 787,814, for oil flotation process for separating ores, held not infringed by licensees of No. 835,120.**

Wolf patent, No. 787,814, covering oil flotation process for separating ores, *held* not infringed by licensees of patent No. 835,120.

In Equity. Suit by the Wolf Mineral Process Corporation against the Mineral Separation North American Corporation. Bill of complaint dismissed.

Jacob F. Murbach, of Baltimore, Md., William M. Chadbourne, Leonard A. Watson, Willis B. Rice, Clinton De W. Van Siclen, and Carroll R. Ward, all of New York City, and Alfred H. Phillips, of New Haven, Conn., for plaintiff.

Venable, Baetjer & Howard, of Baltimore, Md., Henry D. Williams and William Houston Kenyon, both of New York City, Lindley M. Garrison, of Jersey City, N. J., and Edward Thomas, of New York City, for defendant.

SOPER, District Judge. Twenty years ago an important invention was made in the art of metallurgy relating to the separation of the metallic substances in pulverized ores from the nonmetallic constituents, consisting of quartz or rocky material, called gangue. In the prior art, ore concentration in actual practice consisted of water or gravity concentration, wherein, under different conditions of agitation, the separation of the quicker settling particles from the slower settling particles was effected. It was also well known that oil and oily substances had a selective affinity for minute particles of metal found in crushed ores, but would not unite so readily with the gangue. Several unsuccessful efforts had been made to utilize this characteristic of oily material, in which varying amounts of oil had been employed; but the only oil process which had been used in commercial practice was the Elmore process, wherein a flowing pulp of water and crushed ore was mingled with oil in the proportion of one to three tons of oil to a ton of ore, and the metalliferous particles floated to the surface by the buoyancy of the oil. This process was used with technical success at several mines, but was not commercially profitable, because of the cost of operation, in view of the loss in oil, and the inability of the process to treat minerals in a fine state of subdivision, called slimes. Since these contain a substantial percentage

of metal, a process which fails to treat them is impractical.

The processes in which oil was then employed were roughly divisible into two classes. In the first class was the surface flotation process, of which the Elmore was the chief example. The other class was known as the metal sinking process. Its chief example was the Cattermole process, in which the oil used varied in extent from 4 to 10 per cent. of the metalliferous matter. In this process, the small metallic particles were coated with the oil and concentrated into granules, which were heavier than water, so that they would sink to the bottom of the containing vessel, permitting the gangue to be carried away by an upward flowing stream of water. This process had great advantages, since the amount of oil employed was relatively small, and it was also possible successfully to treat slimes. Indeed, in the year 1905 the Cattermole process had been reduced to practical form in Australia, where a plant of commercial size had been erected for business operations.

Just at this time the process covered by United States patent No. 835,120 of 1906 to Sulman, Picard and Ballot, and by the corresponding British patent, No. 7,803 of 1905, was invented. It consists of the use of a minute amount of oil, amounting to a fraction of 1 per cent., on the ore, and beating air into the mass of ore and water, so as to cause the formation of a froth of a particularly coherent character, composed of air bubbles containing only a trace of oil, whereby a very high percentage of the metal in the crushed ore is carried to the surface of the mixture. It is obvious that such a process is not of the metal sinking class. It also varies substantially from the surface flotation process already described. The lifting force which separates the particles of metal from the gangue is not found in the buoyancy of the oil used, but in the buoyancy of the air bubbles introduced into the mixture by an agitation greater than that which had been resorted to in the prior art.

"The process was an immediate success. The record shows, not only that the process in suit was promptly considered by the patentees as an original and important discovery, but that it was generally accepted as so great an advance over any process known before that, without puffing or other business exploitation, it promptly came into extensive use for the concentration of ores in most, if not all, of the principal mining countries of the world, notably the United States, Australia, Sweden, Chile, and Cuba, and that, because of its economy and simplicity, it has largely replaced all earlier processes."

The invention and the prior art were thus described by the Supreme Court of the United States in the case of Minerals Separation, Ltd., et al. v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286. The validity of the patents covering the process was vigorously assailed, both in the United States and in Great Britain, but was sustained by the courts of both countries, as will appear from the following citations: Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Id. (D. C.) .207 F. 956; Id. (C. C. A.) 214 F. 100; Minerals Separation, Ltd., et al. v. Butte & Superior Mining Co., 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019; Id. (D. C.) 245 F. 577; Id. (C. C. A.) 250 F. 241; Id. (D. C.) 274 F. 878; Minerals Separation, Ltd., v. Miami Copper Co. (D. C.) 237 F. 609; Id., 244 F. 752, 157 C. C. A. 200; Id. (D. C.) 264 F. 528; Id. (D. C.) 268 F. 862; Id. (C. C. A.) 269 F. 265; Id. (D. C.) 275 F. 572; British Ore Concentration Syndicate, Ltd., v. Minerals Separation, Ltd., 25 R. P. C. 741; Id., 27 R. P. C. 33; Ore Concentration Co., Ltd., v. Sulphide Corporation, 31 R. P. C. 206; Id., 31 R. P. C. 214.

The present owner of United States patent 835,120 is Minerals Separation North America Corporation, the defendant in the case at bar. The suit was brought on April 10, 1922, 17 years after the froth flotation process was made known to the world. The plaintiff is Wolf Mineral Process Corporation, which is the present owner by assignment of United States patent 787,814, issued to Jacob David Wolf on April 18, 1905. There are two causes of action in the bill of complaint. The first charge is that the defendant has infringed the Wolf patent, and, in addition, that the defendant has licensed other persons to use the process covered by United States patent 835,120, although, as the defendant knew, that process requires for its successful operation the use of the Wolf patent. Such infringement, the bill charges, has in fact taken place under instructions given by the defendant.

[1] The second cause of action is based upon a charge of fraud. The plaintiff alleges that United States patent 835,120, although registered in the name of the defendant, belongs in equity to the plaintiff. This claim is based upon a contract of February 5, 1903, between Jacob David Wolf, the plaintiff's assignor, and the firm of Sul-

man & Picard, two of the three joint inventors of United States patent 835,120. Briefly stated, the claim is that Sulman & Picard were employed by Wolf to investigate a process invented by him for the separation of minerals from their ores, and to improve the process, and deliver to him detailed reports of all discoveries made during the course of the investigation; that Wolf fully performed the contract on his behalf, and that Sulman and Picard partly performed the same by making tests and certain reports thereof to Wolf, and by assisting him in the application for the patent in suit, but that they broke their contract by concealing from him, and by communicating to others, the results of certain experiments, and by permitting Sulman, Picard, and Ballot to apply for defendant's patent, 835,120, which is based upon the experiments, and therefore belonged in equity and good faith exclusively to Wolf. By various assignments the defendant got record title to the patent, but received it, it is charged, with full knowledge of the fraud.

The answer admits the granting by the defendant of numerous licenses under its patent, but denies the charges of infringement and of fraud. It also sets up the affirmative defenses, or stare decisis, res adjudicata, and laches, more fully described below.

It will be convenient, first, to consider the second cause of action. It is not claimed that Wolf himself devised the flotation froth process, in which the metal is lifted to the surface of the liquid by the buoyant force of air, but that he conceived the idea of reducing the quantity of oil theretofore employed in the Elmore and other oil flotation processes, by increasing the degree of violence of the agitation of the mixture; that in the experiments in which this idea was applied by Sulman and Picard a float was produced, containing metal which was lifted, not only by the buoyant force of oil, but to a very large degree by the flotation power of air bubbles which the agitation necessarily formed; that Wolf, being ignorant of the scientific laws underlying the process, did not recognize the significance of the experiments, but that the chemists did recognize it, and in violation of their trust concealed the discovery from Wolf, and subsequently developed it for the profit of themselves and their chosen associates.

Wolf was a promoter, residing in London, interested in oil and mining properties. He had no technical knowledge of metallurgy, but perceived the profit to be derived by one who might solve successfully the problems of ore concentration. Learning that the Elmore process was commercially impracticable, he conceived the idea, according to his testimony, that if the pulp were violently agitated, so as to break up the oil into very small particles and bring them into intimate contact with the ore, the work might be done with a smaller quantity of oil. In the latter part of 1901 he discussed this idea with Sir Frank Crisp, a leading company solicitor of London, and showed him a crude experiment in which a mixture of oil, ore, and water was shaken in a bottle. Wolf described it as a rough test. He used a wide-mouthed bottle, about 8 or 10 inches high, with a diameter of about 2 inches, or something of that sort. He used crushed copper ore, but did not measure or weigh it. Roughly he put in probably an inch or an inch and a half in the bottom of the bottle. The water covered about half of the bottle. He then put in some oil, about one-eighth or one-quarter of an inch, something of that sort, and shook the bottle very vigorously. The result was that some of the mineral came to the top with the oil and stuck to the oil.

The plaintiff's counsel attach much importance to this experiment. Indeed, they claim that thereby, for the first time in the history of the art, mineral was recovered by flotation from a fluid ore pulp by the use of a small quantity of oil, and that it was accomplished by a degree of agitation which theretofore had been considered detrimental and necessary to avoid. But a description so grandiose hardly fits so uncertain an incident. It is true that the agitation in the Elmore process was of necessity quite gentle; but it is impossible to determine accurately, from the testimony as to Wolf's bottle experiment, in what proportions the ingredients of oil, ore, and water were used, or what was the degree or duration of the agitation, or what was obtained when the test was finished. From the standpoint of one skilled in the art, the experiment was no doubt a total failure as an exhibition of the efficient separation of minerals from their ores.

In order to ascertain the patent situation, Wolf visited a patent agent in 1902, and was put in touch with Scammel and Muskett, patentees of a process for the production of an oil compound whereby oil treated with sulphur chloride could be made very viscous, and used in the production of a substitute for rubber. Wolf induced the patentees to investigate the availability of the treated oil in a process for ore concentration Experi-

ments were made, and the provisional specification for British patent 15,280 for the Scammel ore concentration process was filed by Scammel on July 9, 1902. Wolf then sought the assistance of the firm of Sulman & Picard, who were skilled metallurgical chemists, and at that time, as at the present day, of good repute in England. They were greatly interested in the concentration of ores by the use of oil, and had been employed for about two years in experiments to test and improve the Elmore oil process for a syndicate of which John Ballot was a member. They had tried different degrees of agitation of the oil, varying all the way from a gentle rolling over of the oil and pulp to a violent agitation by passing through a centrifugal pump or cone mixer. In the end, it was found that gentle agitation was sufficient, and caused no unnecessary breaking up of the oil, while insuring a clean concentrate.

Wolf testified that in July, 1902, upon his first visit to Sulman, he exhibited his bottle experiment, and suggested the reduction of the quantity of oil by violent agitation, whereupon Sulman ridiculed the idea. Sulman has no recollection of the bottle experiment, but it is not unreasonable to conclude that it was shown to him, and in the lapse of time altogether forgotten. From the standpoint of a skilled metallurgist, who had performed hundreds of experiments in the concentration of mineral by the use of oil, both on a small and large scale, the incident of a promoter, without scientific experience or knowledge, who produces a bottle with unmeasured quantities of oil and ore, would be likely to make very little impression. Sulman does not deny that in the subsequent experiments he was requested by Wolf to increase the violence of the agitation, and thereby reduce the quantity of oil necessary for the process. He has no recollection of the conversation, but agrees that it is very likely that, had the request been made, he would have regarded it as ridiculous, for the reason that it would have been regarded impracticable in July, 1902, when the only successful flotation process required a sufficient quantity of oil to bring the mineral to the surface by the buoyancy of the oil. That it was desirable to decrease the quantity of oil, because of the expensive character of the Elmore process, was well known; but there was no known method of accomplishing the result. Violent agitation was not helpful, for the reason that experience had shown that it caused an emulsifying of the mixture, which prevented the oil from coming together again on the surface of the liquid with its load of mineral, and made impossible the concentration and separation of the ore. In fact, Wolf himself testified that in experiments in the laboratory Sulman made no attempt to decrease the quantity of the oil, but deferred this test until a trial plant could be built and operated. This point was in fact never reached.

The dealings between Sulman and Picard and Wolf are made clear by the correspondence. It opens with their letter to Wolf of July 23, 1902, under the caption, "Scammel Oil Concentration Process." It refers particularly to a sample of oil tested, and of the difficulty in getting the oil globules to reagglomerate after the preliminary breaking up, and suggests careful experiments to ascertain the action of the sulphur chloride. Wolf is advised to secure the opinion of counsel as to the possible infringement of the Elmore patents by the Scammel process. The use of sulphur chloride is said to be undoubtedly novel, but it is desirable to find out if its action in producing a thickened oil infringes the claims of a patent which expressly covers thick and viscous oils. In August, Sulman brought Wolf into contact with John Ballot, of the Australian Ore Concentration Company, which had been investigating the Elmore process, and there was some correspondence between them; but it failed to interest Ballot, who finally refused to entertain it.

During the latter part of 1902, Wolf was in negotiation with engineers for the erection of a trial plant, which, however, came to nothing. But he kept in touch with Sulman, and received from him a letter, under date of November 15, 1902, which refers to recent interviews and offers to undertake tests on "your oil concentration process." It suggests tests of various oils, with varying amounts of sulphur chloride, and tests with prepared oils and different kinds of ore. The scope of the process is said to be wider than of previous oil processes, because of its decided action on blende ores, and because the chemical used produces different effects, according to the quantity employed, and the nature of the oil. It offers to undertake an investigation for the sum of 100 guineas per month. In a postscript, the letter says: "We think it right to acquaint you with the fact that we are now advising other parties on another oil process, which, however, is essentially different to your own." The reference is to the Cattermole process, as will later appear.

Finally, after the lapse of several months,

a contract of February 5, 1903, was entered into between the parties. The chemists agreed to investigate and carry out the tests on Scammel's oil concentration process, as suggested in their letter of November 15, 1902, and to endeavor to ascertain the proper proportion of chloride sulphur to be used with various oils, so as to obtain the best possible extraction of metals from the pulps and slimes of various typical ores and to construct exact formulæ for the most economical and efficient working of the process on a commercial scale. The chemists promised to advise Wolf in writing as to the scope of the process and on all points during the building of an experimental plant. They agreed to observe and impress upon their employees the strictest secrecy in regard to the investigation; to make and deliver to Wolf fortnightly reports of the investigation and of all discoveries from time to time made or worked out in the course of investigation of experiments by themselves or assistants in connection with the process, all such discoveries to belong to Wolf absolutely. The chemists agreed to render assistance in the patenting of the inventions. Wolf agreed to pay the chemists 100 guineas per month. The agreement, so far as actual service by the chemists and the liability of Wolf to pay is concerned, was determinable at any time by Wolf alone, by giving the chemists seven days' notice, but such determination should not prejudice the rights of Wolf in respect of any of the things provided for.

There can be no question, after an examination of the correspondence and the contract, that the matter for investigation was the Scammel process alone. While the letter of November 15th, addressed to Wolf, speaks of "your process," it is manifest, from the writings taken as a whole, that one process only, and that the Scammel process, was the subject of negotiation between the parties. If Wolf had made any discovery on his own account, or was in possession of any other idea of value, which he suggested to the experts for investigation, it was considered of so little importance that no reference to it was made in the contract. This is the more significant, since the contract was prepared for Wolf by Crisp, a lawyer of ability and reputation.

Before considering the work of Sulman & Picard, it is desirable to inquire into the nature of the Scammel process. The Scammel patents followed the first British patent to Scammel and Muskett of 1901, for a process of solidifying oils by treating them with a solution of chloride of sulphur to produce a rubber substitute. It was this patent which sent Wolf to Scammel. After interviews between them, and experiments by Scammel, the two Scammel patents for ore concentration processes, the British patent of 1902 and the United States patent of 1903, were secured. It was the provisional specification for the British patent which was referred to in Sulman's first letter of July 23, 1902, to Wolf.

The patent specifies a process of separating metals from their ores, which consists in bringing the finely ground ore, suspended in water, into contact with chloride of sulphur, diluted with oily or greasy matter. The chloride of sulphur is thoroughly mixed with oil, and the mixture is run in a continuous stream into a revolving dasher or churn, together with a stream of finely powdered ore, suspended in water, and the whole is thoroughly agitated. After the lapse of a certain time, the contents of the churn are run into settling pans, wherein the metallic particles, in combination with the sulphochlorinated oil, are found floating on the top of the mixture.

There are many references in the British and United States specifications to the flotation of the mixture, from which it is clear that the mineral is brought to the surface and floated by the buoyancy of the oil. When the patent was in the United States Patent Office, the examiner pointed out that the only distinction over the processes of Elmore was in the addition of chloride of sulphur to the oil employed, and declared that the function or utility of the chloride of sulphur should be affirmatively shown. The applicant replied that oil so treated will take up minerals that cannot be recovered by oils hitherto employed. In further argument, the applicant pointed out that, in the Elmore process, the number of oils which could be used was small, but, when oils are treated with chloride of sulphur, chemical changes occur, nearly always accompanied by a considerable increase is viscosity, a high degree of which is necessary in order to utilize the flotation power of oil. The applicant requested to be relieved of the requirement of furnishing a drawing, for the reason that the apparatus in which the process is carried out had not been invented by the applicant, and formed the subject of a separate application in a different name. This reference was undoubtedly to the Wolf patent, which will be hereafter considered. Such, in brief, was the Scammel process. It was devised at the instance of Wolf, who obtained an option on it after it was pre-

pared, and had such control over the patent that later on he combined it with his own in New South Wales and other countries, where such combination could lawfully be made.

There is no specific description in this patent, nor in the Wolf patent, of the proportion of oil to ore, but the description of the result of the process, wherein the oil floats on the top of the mixture, carrying mineral particles imbedded, shows that enough oil must be used to sustain the weight of the mineral at the top. To persons skilled in the art as it was then developed, and familiar with the Elmore process, the direction of the patent was clear enough, so far as the amount of oil was concerned. In this respect the decision of Neville, J., in British Ore Concentration Syndicate v. Minerals Separation, Ltd., 25 R. P. C. 741, at page 753, with reference to the Elmore process, is pertinent:

"He tells us exactly what is to be done in all but one particular, and that is, when he indicates the amount of water which he desires to put with the ore, he does not precisely indicate in measure the amount of oil which should be used, and it is said that he is silent on the matter, and that there is no indication of how much oil he intended to be used; but I think that he does indicate quite clearly, in a sense, the amount of oil that is to be used, because he shows that he intends to float the whole of the metallic particles in the ore by means of the oil, and I think, therefore, that a practical person could calculate beforehand a sufficiency of oil to raise the metallic particles to the surface of the mixture that he makes. It is said that in practice it is ascertained that a less quantity of oil is necessary than would be supposed if you merely made the mathematical calculation by weight, and the reason for that is said to be that, in the process described by Elmore, a certain aeration of the water takes place, resulting in an additional lifting force being provided for the particles, which assists and promotes the flotation which he desires. Though no doubt that is so, I think the degree to which it operates must vary according to every variation of the method by which his process is carried out; and I think that, if his process is fairly carried out as he describes it, no more than a small proportion of the flotation will ever be accounted for by the operation of the physical law of surface tension, and I am satisfied from reading the specification that he never intended to indicate in any way the practical application of the law of surface tension for the purpose of separating his metals from his gangue, but that he relied, as I think he plainly tells us, upon the lower specific gravity of oil, intending to use a sufficiency of oil to float the metallic particles in the ore by reason of its lesser specific gravity."

The Scammel invention was an improvement upon the Elmore process by the sulphur chlorination of the oil. No information is given as to improvement in other particulars, and one who was familiar with the methods and limitations of the Elmore process would be justified in the belief that, except for the treatment of the oil, the same conditions would exist in the Scammel process. The amount of oil would be determined by the experience obtained in the trial of the Elmore method, and, although thorough agitation is specified in the Scammel patent, there is nothing in the patent to indicate that there was any less necessity to avoid in this process than in the former the emulsification of the oil which too vigorous agitation with large quantities of oil produced.

Bearing in mind the nature of the Scammel process, the reports of Sulman & Picard of the experiments performed by them for Wolf under the contract may be examined, in order to ascertain whether therein they conceived the germ of the idea of the froth flotation process. It is charged that the agitation employed in these experiments, being much more violent than that in the Elmore process, must have been accompanied by an aeration of the mixture, so that the float finally secured was supported in large measure by the buoyant force of air. The experiments covered a period from February to April, 1903, during which five lengthy reports were made by Sulman & Picard to Wolf. There are many references in these reports to vigorous or violent agitation. It is suggested that the degree of agitation should be varied, according to the fineness of the crushing of the ore; that there should be gentle tipping or rolling for the sands, and vigorous agitation for the slimes.

The mixer was of the cone type, and was capable of a certain amount of aeration. It was found that slimes could be concentrated by the more vigorous agitation of the treated oil, since it recovered well after it was broken up in the mixer, and recoalesced on the surface of the mixture, bringing the metal with it. This was a new and important feature, because, with the untreated oil in the Elmore process, violent agitation produced an emulsion of ore, oil, and water,

which made concentration and separation of the mineral impossible. But, while violent agitation and breaking up of the oil is emphasized in the reports, it is made clear that the agitation must not be so violent as to prevent the reagglomeration of the oil. The chemists testified without contradiction in the case at bar that the agitation which could be suitably employed in the process was more violent than that used in the Elmore process, less violent than that in the Cattermole process, hereinafter described, which was in turn less violent than the agitation employed after the froth flotation process was discovered and put into use.

The quantities of oil that were used throughout the experiments were similar to the proportions used in the Elmore process; for the most part, 100 per cent. of oil to ore, and in no instance less than 50 per cent. of oil to ore. In none of the reports, which it is conceded were rendered before there was any controversy between the parties, or motive for falsification, is there any reference to aeration of the float or the lifting or holding of the mineral at the surface by the force of air. Indeed, all of the reports are consistent with the idea that the float was sustained by oil buoyancy, as in the Elmore method.

One experiment, which perhaps above all others the plaintiff emphasizes, is that in which the ore was crushed to a very fine state of subdivision, and was beaten with water and oil in an egg beater at the average rate of 120 revolutions of the handle per minute. The plaintiff urges that there must have been aeration of the mixture, and an aerated float produced in this experiment. The account makes no mention of aeration. Such an experiment was performed by the defendant in court, and since the beaters were so arranged as to cut only through the lower sections of the layer of oil on the surface of the mixture, no aerated float was produced, although there was a thorough mixing of the oil with the water and ore. This demonstration plaintiff's counsel assail as an unworthy subterfuge, complaining that the conditions of the original experiment were not reproduced. The uncontradicted testimony, however, is to the contrary. It is not unlikely that in some experiments some aeration of the mixture took place; but, if so, no significance was attached to the occurrence, for no mention of it was made in the reports which plaintiff admits to be honest.

George A. Chapman, an employee of Sulman & Picard, conducted the experiments in the laboratory. He kept a notebook, in which is found an account of this experiment, as well as the other tests which formed the basis of the formal reports made by his employers to Wolf. There is no mention in the notebook of aeration, or of an aerated float. The plaintiff places doubt upon the genuineness of the notebook, because it is thought not to be sufficiently voluminous to cover three months' work, and also because, at one stage of the proceeding in 1904, a copy of it was requested by Wolf and denied by Sulman & Picard. The suggestion is that it would have been very easy to reproduce the notebook, leaving out the significant experiments, and that there must have been some sinister reason for refusing a copy to Wolf. The notebook, however, is produced in evidence, and has the appearance, both as to form and substance, of being a genuine record of the work. It is very difficult to believe that it is a rank forgery. It is more difficult, since the reports themselves, which have been in plaintiff's custody, are substantially the same as the contents of the book.

The experiments upon the Scammel process were followed by the filing of the specifications for the Wolf patent. It was taken out by Wolf, with the assistance of expert patent agents and of Sulman & Picard. The agents were friends and coworkers with the metallurgists, and the internal evidence of the patent must be considered in connection with the fact that it represents the declarations of the persons now charged with fraud. Nevertheless it is of value in determining the character of the work which they did for Wolf, for it covers the same ground treated in the reports of Sulman & Picard to Wolf, and summarizes the discoveries there disclosed. The defendant claims, and the evidence bears out the charge, that the Wolf patent is in fact an invention of a bulk oil process. United States patent 787,814, was applied for May 22, 1903, and issued May 18, 1905. It describes a process for the separation of metals from their ores, in which the oil is treated with chloride of sulphur, in order to increase the viscosity. The process consists in agitating pulps with the oil until it has taken up all the metallic contents with some gangue, separating the mineral-bearing oil from the pulps, and removing the particles of gangue from the oil by passing it through warm water, and finally separating the metals from the ore. It omits to specify the amount of the oil, as did the Elmore patent, discussed by Neville, J., in the quotation above set out; but it contains numerous references in the

specification which show that the process relies upon the buoyancy of bulk oil to carry the mineral.

The degree of agitation is not described in the patent, but it is fair to assume that one skilled in the art of the day would understand that the agitation should not be so great as to interfere with the recoalescence of the oil after it was broken up. The specification and the claims do state that there shall be such agitation that the whole of the mineral content is taken up by the oil, together with some gangue. This indicates a longer agitation than the Elmore process, but not necessarily a more violent one. No claim is made for the treatment of slimes. The apparatus shown in the drawing for mixing is said by the plaintiff to be capable of aeration. Be this as it may, there is nothing in the patent which suggests aeration, or that flotation of the mineral is accomplished in any way other than that with which the art was already familiar.

When considering the novelty of the patent, it is not unfair to accept the declarations of the applicant, as set out in the file wrapper. The Elmore patents were cited by the examiner, whereupon the applicant pointed out the difference between the Elmore and Wolf inventions. He shows that Elmore did not suggest removing suspended particles of gangue from the oil by passing it through warm water, nor the recovery of oil from the waste pulps by blowing air through them. Further, he did not contemplate the use of sulpho-chlorinated oil. Again, the limited scope of the patent was shown by the reply of the applicant when the examiner suggested an interference with the Scammel patent. The applicant declared that Scammel invented the sulpho-chlorinated oil process; that applicant took the matter up, and in the exploiting of Scammel's invention made certain improvements thereon, such as the hot water treatment forming the subject of the Wolf application. He did not wish to claim Scammel's invention in any way, and did not desire that the interference should be set out, particularly as the Wolf invention was an improvement on Scammel's. Finally, on March 2, 1904, upon the demand of the Patent Office, Wolf signed a concession of the priority of the Scammel process.

Two improvements upon the Scammel patent are found in the Wolf patent. The float, consisting of the oil-bearing mineral and some gangue, is run through a vessel containing hot water, whereby the viscosity of the oil is lessened, and the gangue is dropped out; second, an apparatus is designed for the recovery of oil from the pulps, by forcing air through them. These are the only disclosures by which the Scammel process was enlarged or improved. The virtue of the sulpho-chlorinated oil belonged entirely to the Scammel patent itself. These two patents, consisting of the Scammel invention and the improvements thereon in the Wolf patent, were combined in one specification, and patented in Australia and other British provinces. In the New South Wales patent to Wolf of 1903, which was put in evidence as an example of these combined specifications, claim 2 is as follows: "A process of separating mineral constituents of ore from gangue, which consists in agitating pulps or the like with oil treated with chloride of sulphur, and running off the floating oil, carrying the values." In short, it is a description of an oil buoyancy process, with no mention of aeration.

The plaintiff attempted to demonstrate in court the apparatus described in the Wolf patent, in order to show that such agitation as was used in the Sulman & Picard experiments, as well as the agitation of which the Wolf mixer is capable, must of necessity produce, even with a large proportion of oil to ore, a float sustained in large measure by bubbles of air. The mixer was used to agitate a mixture of water, oil, and ore, in which the proportions in weight of oil to ore was 100 per cent., at a sufficient speed to produce a ready circulation of oil and pulp running down through a central tube and upwardly between the tube and the outer vessel. The process was run as a continuous operation, and the stream, as it came out of the mixer, was flowed into a spitzkasten. When the agitation was stopped, it was found that on the surface of the mixture in the spitzkasten there was an aerated float, consisting of oil with entangled air bubbles, interspersed with a paste containing water, oil, and ore. Plaintiff's expert said that the ratio of the buoyancy due to the air to the buoyancy due to the oil was as eight to one. In other experiments, in which the amount of oil was reduced, the float contained more air and more mineral. It is admitted by the plaintiff that, from the standpoint of one who sought a successful concentration and separation of the mineral from the ore, these experiments were failures. At the conclusion of the first experiment, in which 100 per cent. oil was used, mineral was found in all parts of the apparatus, including the mixer, the spitzkasten, the device for separating oil from the ore, etc. In none of the experiments was there any separation.

However, since aeration was produced, it is urged that Sulman & Picard must have noted a like phenomenon, and seized it for their own private exploitation. But, on the other hand, it must be remembered that, long before Sulman & Picard made the acquaintance of Wolf, they had experimented with varying degrees of agitation upon the Elmore process. Neville, J., found that in the Elmore process a certain aeration takes place, resulting in a small addition to the lifting force of the oil. See 25 R. P. C. 741, at page 753. In the same case on appeal, Lord Shaw reached the same conclusion, and added (see 25 R. P. C. 33, at page 53): "I am quite certain that, if it had been suggested to Elmore that the production of air bubbles was of any value or assistance in the process of separation, which he was meaning to promote, he would have repudiated the idea. And it is significant to observe that, after the first flotation under the Elmore process, and when a second use of the oil is being made, the inventor himself in his complete specification of 1898 says: 'The oil may be pumped up to an elevated cistern to supply the drums c and g, but in order to clear the oil from air bubbles I prefer to draw the oil up to the cistern by creating a further vacuum in the cistern.'" Doubtless the more violent agitation in the Wolf experiments tended to increase the aeration of the mixture. But it was not first disclosed to the chemists by their work for Wolf. They had already identified it as a source of trouble in the Elmore investigation.

Sulman & Picard testified that, at the time they were working for Wolf, they had no conception of the selective affinity of air for mineral. Nothing in the testimony so far reviewed casts doubt upon the veracity of this statement. But the evidence affirmatively shows how the air flotation process was discovered. This must be examined, not only because it is vital to a determination of the second cause of action, but because the plaintiff claims that the explanation is so incredible as to support the charge. According to the chemists, the origin of the successful idea is found in an incident which took place at a dinner at the end of June or the early part of July, 1903. A grape was dropped into a glass of champagne. The bubbles generating from the wine adhered to the surface of the grape and raised it to the top of the wine. They would then break, whereupon the grape would sink and gather fresh bubbles, and the process was repeated. It seemed to the partners that there was a tendency of the bubbles to attach themselves to the slightly greasy surface of the grape, where it had been handled by the fingers. They wondered if bubbles of air might not be used in the separation of ores.

By this time the firm had had experience with the Cattermole sinking process. Cattermole was a mining engineer, who began experimental work in his own home upon oil concentration processes early in 1901. He discovered that, if the quantity of oil was reduced to something less than 10 per cent. of the weight of the mineral and violent agitation was employed, particles of metal would become coated with oil and concentrated into granules, heavier than water, which would sink to the bottom of the vessel, while the lighter sands could be carried off by an up current of water. He met Sulman in October, 1902, and showed him some experiments. Sulman became interested in the process, and after some correspondence in November, placed his laboratory at the disposal of Cattermole, suggesting that the firm would make satisfactory arrangement for developing and financing the discovery for a certain consideration. One of these letters was written on November 15, 1902, on the same day as the letter to Wolf wherein reference to a competing process is made. Sulman & Picard at once recognized the possible value of the Cattermole process. Employing as it did a very small proportion of oil, as compared with the Elmore process, and having capacity to treat slimes, it was a great step in advance. Indeed, as appears from correspondence in the early part in 1904, after Sulman & Picard were employed by Wolf to supervise tests at an experimental plant, they were of the opinion, and so wrote to Wolf, that the other process upon which they were experimenting, meaning the Cattermole process, was distinctly superior to any oil process then known.

In the meantime, in February of 1903, John Ballot and other members of the Australian syndicate, which had without success previously investigated the Elmore process, formed the Cattermole syndicate, in which Cattermole and Sulman & Picard had a financial interest. Cattermole had been advised, for his own protection, before divulging his process to persons who would finance it, to apply for a patent, and consequently provisional specifications for two British patents were filed on November 28, 1902; the complete specifications being filed on August 28, 1903.

The Cattermole investigations were made in the Sulman & Picard laboratory from the fall of 1902 until April, 1905, when the froth

process was discovered. At first they were conducted by Cattermole, working alone. In April, 1903, after the Wolf experiments were finished, Chapman assisted. The plaintiff urges that Chapman introduced in the process the violent agitation which he had discovered in the Wolf experiments; but the notebook of Cattermole, reporting the experiments which he made in his own home during the year or two before October, 1902, contains much reference to agitation, and its effect. It was entirely proper that, with Chapman's help, a mixer should be used, capable of giving any desired degree of agitation. Since the proportions of the oil were small the evil effects of emulsification, which were detrimental to the Elmore and Scammel-Wolf processes, were not felt in the Cattermole process. On the contrary, emulsification was desirable in order to secure granulation of the mineral.

From April, 1903, until the early part of 1904, work upon the Scammel-Wolf process was at a standstill, pending the construction of an experimental plant. In the meantime, the Cattermole experiments went ahead. during the same interval, the incident of the floating grape took place. It was communicated to Ballot, and provisional specifications, applying the idea to ore concentration, were filed on July 23, 1903. Shortly thereafter, however, the partners discovered the publication in a chemical journal of the Froment patent of 1903, which showed that their invention had been anticipated. Subsequently, in August, the Cattermole, Sulman & Picard application of 1903 was filed. The subject-matter of this patent was the use of soap to coat to a very slight degree mineral particles with a layer of an oily substance, accomplished by dissolving and decomposing a small quantity of soap in the pulp containing mineral particles. When the mixture was subjected to the Cattermole method of agitation, the particles became agglomerated into granules. Carbonic acid gas was then liberated into the mixture, which attached itself to the granules and raised them to the surface. Later in September, Sulman & Picard applied for British patent 20,419 of 1903, known as the "bubbles patent," whereby the mineral particles were brought to the surface by bubbles of gas or air blown into the pulp. In these processes a froth was not formed, but such flotation as took place was due to the surface tension of the water. None of these processes was a practical success, and all of them were abandoned; but they indicate quite clearly the beginning of the employment of air as a flotation factor.

In December, 1903, Arthur Higgins was employed by the firm, after receiving a scientific education. He was put to work on the Cattermole process while Chapman was engaged on the plans for a model Cattermole plant. This was completed in the spring of 1904, and tested out in London. In some experiments performed in March of that year an interesting development was noted. A defect in the process occurred when a little mineral was carried upward in the upcast with the sands. To recover this mineral, the sands were violently agitated again, with the result that the mineral was entangled with air, and, thereby becoming more buoyant than the sands, could be separated therefrom by an up-current of water. Not much was made out of this part of the process, and it was abandoned, as in the case of the bubbles and soap patents; but it illustrates again the manner in which the experiments on the Cattermole process led to the final and successful use of air as an agency of flotation.

After the model plant was finished, Chapman was sent with it to the Broken Hill mine in Australia. Preliminary experiments were performed in October or November of 1904, and, the tests being satisfactory, plans were formed for the construction of a larger plant. Later in the year Chapman left for England to be married, but was called back in December, in order to confirm the tests in a larger mixer. He again left for England, where in January, 1905, he gave a deposition subsequently used in the case of Sulman & Picard v. Wolf, referred to below. Returning to Australia, he assisted in the construction of the larger plant, which was conducted for a short time, in accordance with the Cattermole idea. He was then instructed to use every effort to cut down the amount of oil below the proportion then employed of 5 per cent. on the mineral content. His efforts resulted in what was called the hybrid process, wherein granulation was not produced; but the heavier sands, after up-cast classification, were placed on shaking tables for the separation of the mineral. In this case, however, the metal was floated by surface tension or skin flotation.

This process was not continued, because word was received from London of the discovery of the froth process in March of 1905. The details were covered by two reports, of March 3, 1905, and March 16, 1905, made by Sulman & Picard to the syndicate. In the first report it was shown that experimental work on the Cattermole process was being

carried on in the London laboratory, in order to determine the influence of seven factors upon the granulation of the mineral, namely, acidity, temperature, speed of Gabbett mixer, ratio of ore to liquor, metallic salts, size of particles, and amount of oil. These factors were to be determined with reference to the employment of oleic acid in one series of experiments, and residuum oil in another.

In the report of March 3, 1905, special comment is made upon the influence of acidity. The second report, of March 16th, is headed "Influence of the Percentage of Oil," so that it appears that the seventh factor above mentioned received immediate attention. The report shows that the effect of diminishing the percentage of oleic acid was to alter the type of oiling; the higher percentages producing granules, and the lower ones froth. Six per cent. of oleic acid on the mineral was sufficient to form good granules, without much froth; as the percentage of oleic acid was decreased, more froth was formed; .62 per cent. was insufficient to form any granules, and nearly the whole of the mineral came to the surface as froth on stopping the cone mixer; .2 per cent. acted in the same manner, leaving coarse sands, but rather more mineral in them. The froth produced, as Sulman and Picard testified, was a highly dense, matted, mineralized froth, apparently almost dry, consisting of vast quantities of bubbles, heavily contaminated by mineral particles, and remaining for an indefinite time on the surface of the water. The froth was produced by very violent agitation, more violent than in the work for Wolf, because it tore the small amount of oil employed into particles, which could not recoalesce. The process was put in operation as soon as possible in Australia, was found to be a remarkable success, and was subsequently adopted in the art of ore concentration throughout the world.

The story of the discovery is trustworthy, and is amply supported by the weight of the evidence, notwithstanding the criticisms to which it has been subjected by able counsel for the plaintiff. The suggestion that violent agitation was used as the result of the Wolf experiments has already been noticed. Equally untenable is the labored argument that Sulman & Picard, having gotten the idea of flotation by air from the Wolf experiments, endeavored in bad faith to discover some other way to produce the same result, and took out the bubbles and soap patents in their own names, instead of giving Wolf the benefit of the discovery.

7 F.(2d)—58

But the plaintiff goes still further. It charges that the final discovery which led to the abandonment of the Cattermole process was made by Chapman in Australia in the latter part of 1904, and not by Higgins in London, in March, 1905. The point would seem to be immaterial, if the discovery belonged to Wolf, under the contract of February 5, 1903. But the plaintiff urges the point, in order to demonstrate the complete falsity of defendant's testimony, and to show that the interested parties were willing to go to any lengths of perjury and fraud in order to conceal that the discovery was made by Chapman, who personally made the Wolf experiments, and to pretend that it was made by Higgins, who came into the laboratory after the Wolf experiments had finished. The contention is based upon the fact that Chapman, having left Australia for England to be married, was called back, a distance of 2,000 miles, to repeat certain experiments. It is urged that this expense and inconvenience would not have been incurred, had it not been that he had already made the new discovery. Chapman explains that he was recalled with reference to the new large scale plant then about to be erected, in order to demonstrate to an expert that the results obtained in the mixer of the model plant could be duplicated on a larger scale. The testimony is credible and consistent with the fact.

In the next place, it is insisted that the perjury of Chapman, Higgins, Sulman, and Picard is shown by the disclosures of an article or address published in 1913 by J. E. Hebbard, manager of the Broken Hill mine in 1904. The article refers to the sending out of the model plant, and the long series of experiments by Chapman in 1904, wherein it was found that the process was making recoveries from the very finest slimes. The introduction of oleic acid was noticed. Chapman's results were very satisfactory, but it was thought wise to have them confirmed by an independent chemist; hence the experiments were repeated. The article refers to the reduction of the quantity of oleic acid in December, 1904, wherein the percentage of 3.5 of acid on the mineral was used, and concentrates were recovered which were partly granulate and partly float or froth.

Hebbard was not called as a witness by the plaintiff, nor was the article offered in evidence as proof of the accuracy of its statements. It was referred to in the cross-examination of Chapman, who, however, denied its accuracy in so far as it tended to

show that the froth process was discovered in December, 1904. He admitted that in the experiments at that time there was some skin flotation and a condition of flocky minerals separated on the table, but said that there was no froth. Nor did Chapman, although uncertain as to precise amounts, verify the statement that the small percentage of oleic acid, indicated by the article, was then used. The article was published some 8 years after the discovery was made. While there was no motive for misstatement of the facts, there was ample opportunity, in a general recital of discovery, to misstate items of time or details of experiments. In any event, since the article is not in evidence, it would be quite unreasonable to accept it as indicating fraud on the part of the persons developing the process.

On the whole, the court finds that the charge that Sulman & Picard, their employees and associates, were engaged in an elaborate scheme to defraud a defenseless client, is without foundation. Indeed, there was no apparent temptation which would lead the metallurgists to prefer Cattermole to Wolf. Neither man had financial strength. Cattermole had been working for a long time, had made a valuable discovery, and was quite willing to share it in consideration of the assistance of Sulman & Picard and their financial friends. Wolf, as has been shown, had discovered nothing of substantial value, except the treatment of oil with sulphur of chloride in a bulk oil process. He was interested in pushing his discovery for whatever money could be made out of it. Business arrangements could as easily have been made with him, had the froth invention been made for his account. It is quite impossible to accept the contention of the plaintiff that the metallurgists, having made the substance of the discovery in the spring of 1903, deliberately suppressed it for 2 years, and finally misappropriated it, after repeated efforts to find a substitute had failed.

Wolf himself doubtless believed that he had been deceived. He first raised this issue in 1904 and 1905, in his counterclaim against Sulman & Picard in the London suit. Some account must be given of this litigation. In the year 1903, and the early part of 1904, Wolf wished to construct an experimental plant for the further testing and developing of the processes covered by the Scammel and Wolf patents. Sulman & Picard offered to superintend a preliminary trial at the plant for £100 per month. On February 19, 1904, they suggested by letter their connection with another oil process which would eventually prove superior to any existing oil process, and offered to retire in order that some other firm might carry out the proposed trials at Wolf's new plant. The Cattermole process was meant, although the name was not mentioned. Wolf expressed himself quite content that the work should proceed on the footing of the existing agreement, as modified by the letter. Some work was done on the plant, but it was so poorly constructed that no satisfactory tests could be had and it was ultimately abandoned. At the end of the work, Wolf was indebted to the firm for some £160.

Failing to make payment after repeated requests, suit was entered in the High Court of Justice in London by Sulman & Picard on July 30, 1904. A complete copy of the pleadings, evidence, and of the opinion or judgment of the court is filed as an exhibit in the case at bar. In answer to the suit, Wolf denied liability and set up the counterclaim, as a breach on the part of the plaintiffs, that they applied for the bubbles patent of 1903, which embodied his oil process and plan, and the results of the tests carried on by the plaintiffs under the agreement of February 5, 1903. It was a distinct charge of fraud. The court held that the substantial contest between the parties did not arise upon the plaintiffs' claim, but upon the counterclaim, a more serious matter, because it involved the charge of theft from Wolf of certain discoveries which they had made on his account and should have kept for him. The Elmore, the Cattermole, the Scammel-Wolf processes, and the bubbles patent of Sulman & Picard were discussed by the court. It was held that in the Elmore and Scammel-Wolf processes there was flotation by oil, but that in the Sulman & Picard process there was flotation by air, and that there was no fraud, since the Sulman & Picard patent was not based upon the contract work for Wolf.

Wolf was by no means satisfied with the decision, and has continued to nurse his grievance for the succeeding 20 years. During this period, beginning when he was 48 years of age, he has done little to earn his livelihood except to endeavor to exploit his patents. Since 1911, having no other occupation, he has tried to persuade men of means to assist him to bring suit against the defendant, or its predecessors in title, and, despite continued refusals and failures, he has continued to make appeal for funds to push the litigation. In the meantime he has lived entirely upon the advances made by

persons who were interested in his story. Finally the plaintiff corporation was formed for the purpose of exploiting the Wolf patent and bringing the present suit. Careful consideration of the evidence requires the finding that, so far as the second cause of action is concerned, the charge of fraud on the part of the defendant, and the claim of equitable ownership by Wolf and the plaintiff of the patent of the defendant, is without foundation. The truth would seem to be that Wolf had a certain proximity of time and place to the discovery, but no mental conception which contributed to the new invention, or facilitated its disclosure.

In view of this finding, it is unnecessary to discuss certain affirmative defenses set up by the defendant as follows:

(1) That the United States Supreme Court, in the cases above cited, with the Wolf patent before it, has decided that it did not anticipate the froth flotation process.

(2) That so far as Wolf and his assignee, the plaintiff company, is concerned, it is res adjudicata, by reason of the decision of the English court in Sulman & Picard v. Wolf, that their employment to develop the Scammel and Wolf processes, wherein the buoyancy of oil is the flotation factor, did not cover or include an invention wherein the flotation factor is air.

(3) That Wolf, by reason of the grant to Sulman, Picard, and Ballot of the British patent of 1905 and its counterpart, United States patent 835,120 of 1906, and by the worldwide use of the patented processes during the past 20 years, has had full knowledge of the claims of the defendant of ownership of the froth flotation process, and his failure to bring suit until 1922 to test either the question of fraud or of infringement of his patent constitutes inexcusable laches on his part, precluding him from a decree, whatever the merits of the controversy originally might have been. The defendant charges that the question of laches is the more important in this case, because the patents have expired, and the only relief to which the plaintiff in any case would be entitled would be an accounting for profits which have long since been distributed.

[2] The remaining cause of action is based upon the charge of infringement of the first claim of the Wolf patent, which is as follows: "The herein described process of separating metals from their ores which consists in agitating pulps with oil until the oil has taken up all the metallic-mineral contents with some gangue, separating the mineral bearing oil from the pulps, removing suspended particles of gangue from the oil by passing it through warm water and separating metallic minerals from the oil."

It may be compared with claim 1 of defendant's United States patent 835,120: "The herein described process of concentrating ores which consists in mixing the powdered ore with water, adding a small proportion of an oily liquid having a preferential affinity for metalliferous matter (amounting to a fraction of one per cent. on the ore), agitating the mixture until the oil-coated mineral matter forms into a froth, and separating the froth from the remainder by flotation."

The plaintiff admits that the Sulman & Picard invention is neither anticipated nor otherwise invalidated by the invention of the Wolf patent, and that the carrying out of the operations of the Sulman & Picard patent is not an infringement of the Wolf patent. The complaint is that the licensees of the defendant do not confine themselves to the operations of the Sulman & Picard patent, but in addition have adopted part of the Wolf invention, whereby infringement takes place. The agitation of the pulps with oil, until the oil has taken up all the metallic contents and some gangue, as directed by Wolf, is described as overtreatment, and the subsequent step, wherein the gangue is removed from the mineral-bearing oil by passing it through warm water, is called retreatment. It is the alleged practice of these two steps in combination by the licensees which constitutes the basis of the complaint.

The operations of the Inspiration Copper Company, one of the licensees, are typical. The ore is ground, and oil and water are added to make a pulp. This is fed to the first of a series of 16 cells in a pneumatic agitation concentration machine. As the pulp passes through the cells, one after another, the agitation yields an aerated mineral-bearing froth, and there is an overtreatment of the concentrate in the sense that a greater mineral recovery is made, at the expense, however, of the contamination of the concentrate with gangue. In other words, it is claimed that, as in the Wolf process, the pulp is agitated with oil "until the oil has taken up all the metallic-mineral contents with some gangue." In the next step in the Inspiration process, the concentrate is removed from the pulp and goes to a series of 6 similar agitation cells, where it is again subjected to agitation, as in the first treatment, without the addition of a new flotation agent, producing a final concentrate

and a middling. The middling is then returned to the ninth cell of the original series for renewed agitation, and thence flows through 8 cells in the series.

The plaintiff speaks of the group of cells secondly used as a washing machine, wherein the overtreated concentrate is subjected to a repeated violent agitation for the purpose of ejecting gangue therefrom. This last step in the operation, according to the plaintiff, passes beyond the scope of the Sulman & Picard patent, and appropriates the retreatment described in the Wolf invention as "removing suspended particles of gangue from the oil by passing it through warm water."

But the argument ignores the fundamental distinction between the processes. The licensees in their operations make use of the lifting force of air bubbles introduced into the mixture by agitation, whereas the Wolf process depends upon the buoyancy of oil in bulk for the separation of the metallic particles from other substances in the pulp. A comparison of the four steps of the process of the patent in suit with the operations of the licensees makes the distinction clear. In the Wolf process, the pulps are first agitated with oil until the oil has taken up all the metal and some gangue. Thus the idea of overtreatment is introduced. But in the operations of the licensees the oil does not do the work here described. It does not take up the mineral and gangue, but merely facilitates the formation of froth, wherein the mineral is taken up and lifted by air. Secondly, in the Wolf process, the mineral-bearing oil is separated from the pulps. In the operations of the licensees, the air buoys up the mineral, and there is no mineral-bearing oil. That which is separated from the pulp is air froth. Thirdly, in his so-called retreatment step, Wolf removes suspended particles of gangue from the oil by passing it through warm water. The specification of the patent explains that "the oil mixture carrying particles of gangue in suspension is passed into the vessel $E$, preferably through a perforated inlet $D$, to break the oil into thin streams which rise through the warm water and drop out the gangue in their upward course on account of the decrease in viscosity."

No such step forms part of the operations of the licensees. There is no suspension of particles of gangue in oil, and no removal of gangue from oil by reducing its viscosity through heat. The licensees, having produced an aerated mineral froth by agitation, destroy it by returning it to the mixing cells for a repetition of the agitation in order to secure a cleaner concentrate. Undoubtedly the purpose in view is to secure a froth richer in mineral and poorer in gangue; but the details of the retreatment step in the two processes are substantially dissimilar. The licensees reagitate the mixture without change of its temperature or viscosity, whereas Wolf drops out the gangue without agitation, by thinning the oil through increasing its temperature. In the fourth and final step of the Wolf process, the metallic minerals are separated from the oil. There is no parallel in the process of the licensees. The mineralized froth is recovered from the liquor, but the quantity of oil is so small that no trace of it appears either upon the mineral or in the water. The oil is lost.

With these disclosures of the Wolf patent in mind, so clearly indicating that the work of separation is done by the oil, it is idle to discuss the capacity of the apparatus, diagrammatically shown in the drawing, to produce an aerated floating concentrate. The patent must be read in the light of a person skilled in the art of the day (Florsheim v. Schilling, 137 U. S. 64, 71, 11 S. Ct. 20, 34 L. Ed. 574), and, so read, indicates, as has been shown, a bulk oil process of the Elmore type, with no suggestion of air flotation. Now it was decided by the House of Lords in British Ore Concentration, Ltd., v. Minerals Separation, Ltd., supra, cited with approval by the Supreme Court of the United States in Mineral Separations, Ltd., v. Hyde, supra, that the Elmore patents were not infringed by defendant's air flotation process. For analogous reasons, the licensees have not infringed the patent in suit. Even if they had used the same sort of overtreatment and retreatment as Wolf describes, except for the difference in the lifting force engaged, this difference was sufficient in itself to distinguish the processes, and defeat the charge of infringement. But the licensees have not executed the overtreatment and retreatment steps, as set out in the Wolf claim, to which the patent must be limited, the more strictly since it is a mere paper patent, that has never gone into actual use. National Malleable Castings Co. v. Buckeye Malleable Iron & Coupler Co., 171 F. 847, 96 C. C. A. 515. The patent does not claim broadly the correlated steps of overtreating and retreating in a process of mineral concentration, but particularly the retreatment of overtreated material by passing it through warm water to remove particles of gangue. This operation,

as appears from the descriptive comparison above set out, the licensees do not perform.

The charge of infringement fails, and it is not necessary to consider the defenses of laches, or res adjudicata, or that Wolf himself is not the first, true, and original inventor of the patent in suit, largely, if not wholly, based, as it was, upon the work of Sulman, Picard, and Chapman. Nor is it necessary to consider the responsibility of the defendant for the acts of its licensees.

The bill of complaint will be dismissed.